# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT IN AND FOR

CENTRAL DIVISION

ERIN V. NIELSON,                          :
          Plaintiff,                      :
                                          :
          vs.                             :
                                          : Case No 2:06-CV-335
SOUTH SALT LAKE CITY and OFFICER          :  Judge Kimball
GARY JASON BURNHAM,                       :
                                          :
          Defendants.                     :
                                          :
                                          :

---

## DEPOSITION UPON ORAL EXAMINATION OF

### GARY JASON BURNHAM

---

TAKEN AT:        36 South State Street
                 Suite 2400
                 Salt Lake City, Utah 84111

DATE:            April 23, 2007

REPORTED BY:    AMBER PARK, RPR, CSR



333 SOUTH RIO GRANDE
SALT LAKE CITY, UTAH 84101
WWW.DEPOMAXMERIT.COM

TOLL FREE 800-337-6629
PHONE 801-328-1188
FAX 801-328-1189

• A TRADITION OF QUALITY •

GARY JASON BURNHAM

April 23, 2007

Page 57

```
 1     Q    Did you go to Logan for classes?
 2     A    No.
 3     Q    And then at Weber State did you ever
 4  receive your degree?
 5     A    Yes.
 6     Q    When did you receive it?
 7     A    2002.
 8     Q    And that was in criminology?
 9     A    December.  Criminal justice with a minor
10  in accounting.
11     Q    And I read somewhere where you had the
12  goal of someday working for the FBI?
13     A    Yes.
14     Q    Is that still your goal?
15     A    No.
16     Q    Have the allegations in this case changed
17  your goal with regard to the FBI?
18     A    I stopped my pursuit while I was still a
19  police officer.  After I got divorced I didn't want to
20  move away from my kids.
21     Q    So your abandoning your goal of working
22  for the FBI was not related to the allegations in this
23  case or the media reports in this case?
24     A    No.
25     Q    While you were at POST did you receive any
```

Page 58

```
 1  training on how to deal with an intoxicated suspect?
 2     A    I don't recall the training.  We went
 3  through -- I don't recall any training specifically
 4  dealing with how to deal with a suspect, intoxicated
 5  suspect.
 6     Q    Did you receive any training at Weber
 7  State dealing with intoxicated suspects?
 8     A    Through my -- that's where I attended POST
 9  is through Weber State.  Are you asking through POST
10  or through my normal courses?
11     Q    Through your normal courses.
12     A    No, I did not.
13     Q    How about through South Salt Lake Police
14  Department?
15     A    I don't recall any specific training, but
16  that's not to say we didn't have any training.
17     Q    You understood as a police officer that on
18  occasion dealing -- when dealing with an intoxicated
19  person they might not respond as a sober person would?
20     A    Can you restate that question?
21     Q    You understood as a police officer, did
22  you not, that on occasion an intoxicated person might
23  not respond to you in the same way that a sober person
24  would in your dealing with them?
25     A    Through my experience, that is correct.
```

Page 59

```
 1     Q    Let me talk a little bit about your job
 2  experience at Tremonton.  While you were at the
 3  Tremonton Police Department did you ever receive any
 4  discipline?
 5     A    No, I did not.
 6     Q    It appears that you have a -- you had a
 7  very good record there at Tremonton.  Is that your
 8  understanding?
 9     A    Yes.
10     Q    And that you ended -- it appears that you
11  ended your employment with Tremonton in October
12  of 1997?
13     A    No, that's when I started.
14     Q    Okay.
15          (Whereupon, Deposition Exhibit No. 2 was
16  marked for identification.)
17     Q    (BY MR. MORTENSEN)  Before I move on to
18  Exhibit 2 let me go back and just ask a couple
19  follow-up questions.  Are you claiming the clergy
20  privilege with regard to your disciplinary action in
21  the Clinton West Ward?
22          MR. CONDER:  Any statements that were made
23  by him, yes.
24     Q    (BY MR. MORTENSEN)  Okay.  And are you
25  claiming privilege with regard to discussions with
```

Page 60

```
 1  Bishop Rogers in the Butler 17th Ward?
 2          MR. CONDER:  Any statements made to
 3  clergy, yes.
 4     Q    (BY MR. MORTENSEN)  Mr. Burnham, you've
 5  been handed what's been marked as Deposition
 6  Exhibit 2.  It's an application for employment.  I'd
 7  ask you to take a look at this and verify for me that
 8  this is filled out in your handwriting.
 9     A    Yes.
10     Q    And does it appear to be true and
11  accurate?
12     A    Yes.
13     Q    On your experience section there's two
14  listings for the Tremonton City Police Department.
15  Are those two listings, did they make a distinction
16  between working part-time for the Tremonton Police
17  Department and then when you became employed
18  full-time?
19     A    The part that I completed?
20     Q    Yes.
21     A    Yes, it is.
22     Q    And did you complete the experience
23  section at SSL0130?
24     A    Yes, I did.
25     Q    Let me go back.  I need to ask a couple
```

1   follow-up questions on this church disciplinary thing.
2   Who is your best friend at the South Salt Lake Police
3   Department?
4       A       Currently or at any time?
5       Q       Back in spring of 2003.
6       A       Probably Aaron Daley.
7       Q       And what's Aaron Daley's position there?
8       A       Now or then?
9       Q       Then.
10      A       A police officer.
11      Q       What is his position now?
12      A       He's with the West Jordan Police
13  Department on a gang unit.
14      Q       Did you ever tell him that there was a --
15  that there had been a church disciplinary council?
16      A       No.
17      Q       Did you ever tell anyone at the South Salt
18  Lake Police Department?
19      A       No.
20      Q       So no one at the South Salt Lake Police
21  Department to your understanding knew that there had
22  been a disciplinary proceeding?
23      A       Until today, no.
24      Q       And did you ever tell anyone at the South
25  Salt Lake Police Department that you had been

Page 61

1       Q       And do you recall meeting with an Eric
2   Nielsen?
3       A       I don't recall his name.
4       Q       Now in this -- let me represent to you
5   that this was provided from your file at the South
6   Salt Lake Police Department.  It's marked confidential
7   and will remain such for purposes of this litigation.
8           MR. PLANT:  Mr. Mortensen, let me
9   interject a concept in regard to confidentiality of
10  the agreement.  They were done so at the behest of
11  South Salt Lake and we want the court reporter and the
12  videographer to know that this deposition will have to
13  be sealed because it does make reference to numerous
14  confidential records.  I don't know how else we could
15  do it.  So I just want to make sure we're all in
16  agreement with that.
17          MR. MORTENSEN:  We are.
18          MR. PLANT:  Go ahead.  Sorry.
19      Q       (BY MR. MORTENSEN)  I'd ask you to read if
20  you would the section called brief history, which
21  starts on the first page of the documents and goes
22  down to the first third of the second page.  You've
23  had an opportunity to read that section?
24      A       Yes.
25      Q       Is it accurate?

Page 63

1   re-admitted into the LDS Church?
2       A       No.
3       Q       Who was at your baptism back in July
4   of 2003?
5       A       A few people from my ward and Jennifer
6   Carlson.  Specific names of people in my ward, my
7   Bishop Ty -- I don't recall his last name right now.
8       Q       No one from the South Salt Lake Police
9   Department?
10      A       No.
11          MR. MORTENSEN:  We've been going for an
12  hour and a half.  Why don't we take a five-minute
13  break and start again.
14          (Whereupon, a recess was taken.)
15          (Whereupon, Deposition Exhibit No. 3 was
16  marked for identification.)
17      Q       (BY MR. MORTENSEN)  Mr. Burnham, I've
18  handed you what's been marked as Deposition Exhibit 3,
19  and I would ask you if you have ever seen this
20  document before?
21      A       No, I have not.
22      Q       Do you recall during your application
23  process with South Salt Lake Police Department that
24  you underwent a psychological evaluation?
25      A       Yes, I do recall.

Page 62

1       A       Except for the -- well, yes, it is
2   accurate.  There is one statement, he denied ever
3   having been in trouble due to sexual behavior and has
4   never regretted any of his sexual behavior.  Except
5   for that one incident when I was 16.
6       Q       What was the incident when you were 16?
7       A       Just with another -- just messing around a
8   little too far with another girl.
9       Q       Tell me when you say messing around what
10  did you do?
11      A       Do I have to answer that?
12          MR. CONDER:  You already volunteered it.
13  Go ahead.
14          THE WITNESS:  Specifically?
15          MR. MORTENSEN:  Yes.
16          THE WITNESS:  I had sexual intercourse
17  with her.
18      Q       (BY MR. MORTENSEN)  And you were asked
19  when you became -- do you recall during this
20  evaluation being asked when you became sexually
21  active?
22      A       It was -- what date -- I don't recall any
23  specific questions.  I mean, it was eight years ago.
24      Q       Okay.  You understood that your sexual
25  history was important to the South Salt Lake Police

Page 64

GARY JASON BURNHAM                                                                    April 23, 2007

```
 1  Department before they hired you?
 2       A    Is that a question?  I'm sorry.
 3       Q    Yes.  Did you understand that?
 4       A    As far as that goes, at the time I didn't
 5  think it was important, no.
 6       Q    As a POST certified police officer did you
 7  have an understanding that a police department wants
 8  to make sure that an officer that it may be hiring
 9  doesn't have any deviant sexual behaviors?
10       A    Yes, I can understand that.
11       Q    And that would be one of the reasons for
12  doing a psychological evaluation is to make sure that
13  there are no deviant sexual behaviors in a prospective
14  police officer.  Is that a fair statement?
15       A    Yes.
16       Q    And is it your understanding that one of
17  the reasons that a police department would not want an
18  officer with deviant sexual behaviors would be to
19  protect the public with whom the police officer may be
20  interfacing?
21       A    Yes.
22       Q    And so the statement here -- and again,
23  realizing you don't have a memory of this, but the
24  statement here that says, he became sexually active
25  when he was married at 25.  That would not be a true
                                                    Page 65
```

```
 1       A    Correct.
 2       Q    With your first wife you'd never had any
 3  type of sexual relations before your marriage?
 4       A    Correct.
 5       Q    And the statement -- let me ask you this,
 6  you regretted your sexual behavior you had with this
 7  girl when you were back in high school?
 8       A    Yes.
 9       Q    So much that you sought out your Bishop
10  and addressed that issue?
11       A    Yes.
12       Q    Do you recall telling anyone at the South
13  Salt Lake Police Department during the hiring process
14  about this girl?
15       A    I did not tell anybody.
16       Q    And in fact if you were asked whether you
17  had been sexually active before you were married and
18  you denied that, that would be an incorrect statement
19  by you?
20       A    That's correct.
21       Q    Just so I'm clear, from the time that you
22  were 16 until the time you were married you had no
23  sexual conduct with any woman -- with anyone during
24  that time period?
25       A    Other than making out and kissing, no.
                                                    Page 67
```

```
 1  statement?
 2       A    That was not the first time, no.
 3       Q    And the first time is when you were 16?
 4       A    15 or 16, yes.
 5       Q    And you had sexual intercourse with this
 6  girl?
 7       A    Yes.
 8       Q    Was it more than one time?
 9       A    Yes.
10       Q    Was it several times.
11            MR. CONDER:  What do you mean by several,
12  Counsel?
13       Q    (BY MR. MORTENSEN)  More than ten?
14       A    Probably.
15       Q    For what time period?  How many days,
16  weeks, months, were you engaged in this sexual
17  conduct?
18       A    We dated for it seems like most of my
19  junior year in high school.
20       Q    So was it for an eight-month period during
21  the school year?
22       A    And during the summer up until the
23  beginning of my senior year.
24       Q    And then you were not sexually active
25  again until you were married?
                                                    Page 66
```

```
 1       Q    During the normal courtship period.  And
 2  that was with your wife?
 3       A    And other people I dated.
 4       Q    Okay.  And back on the first page of this
 5  psychological assessment it said you've been married
 6  for 18 months back July 9, 1999?
 7       A    Yes.
 8       Q    When were you married?
 9       A    November of '97.
10       Q    And then it says, he describes the
11  marriage as great.  At that point in time in your life
12  was that a true assessment of your marriage?
13       A    At the time, yes.
14       Q    So on July 9 of 1999 you felt like your
15  marriage was great?
16       A    Yes.
17       Q    And then right above that it says, he has
18  denied any abuse as a child.  And I think you've
19  earlier testified that you were never sexually abused
20  as a child?
21       A    Correct.
22       Q    You never had any type of sexual
23  experiences as a child?
24       A    No, I did not.
25            (Whereupon, Deposition Exhibit No. 4 was
                                                    Page 68
```

1   marked for identification.)

2       Q     (BY MR. MORTENSEN) Mr. Burnham, you've

3   been handed what's been marked as Deposition

4   Exhibit 4.  This is a packet of documents that appears

5   to me that indicate you have reviewed certain policies

6   and procedures of the South Salt Lake Police

7   Department.  I'd ask that you take a look at that and

8   verify that your signature appears on these pages.

9       A     Yes.

10             (Whereupon, Deposition Exhibit No. 5 was

11   marked for identification.)

12       Q     (BY MR. MORTENSEN)  I've handed you

13   what's been marked as Deposition Exhibit 5.  Let me

14   ask you, do you recognize this document?

15       A     It appears to be personnel policies and

16   procedures for South Salt Lake Police Department.

17       Q     Do you recall reading this document?

18       A     It's been a couple years, but if this was

19   in the policies and procedures manual, yes, I did.

20       Q     Was there a different policies and

21   procedures manual for the South Salt Lake Police

22   Department?

23             MR. PLANT:  I don't know what you mean.

24       Q     (BY MR. MORTENSEN)  Well, as apart from

25   the policies and procedures for the City of South Salt

1   Lake.  Was there a separate one for the actual

2   department?

3       A     I don't know if there is one or not.

4       Q     Okay.  Let me have you turn to Page 22 of

5   this document.  At the top there is a section called

6   professionalism.  And it says, the City is a

7   professional association whose purpose, among others,

8   is to provide professional services to its citizens.

9   Do you recall reading this statement?

10       A     It appears familiar, yes.

11       Q     And do you agree with it?

12       A     Your question was do I agree with the

13   paragraph of the professionalism?

14       Q     Yes.

15       A     Yes.

16       Q     Let me have you turn to Page 25.

17   Paragraph -- or sub topic six it says outside

18   activities.  It says, City employees should not use

19   City-owned property in support of outside interests

20   and activities when such use would compromise the

21   integrity of the City or interfere with the employee's

22   duties.  Outside employment must not be of a type that

23   would reasonably give rise to criticism or suspicion

24   of conflicting interest or duties.  Do you recall

25   reading this?

1       A     Yes.

2       Q     And do you agree with that statement?

3       A     Yes.

4       Q     And you understood if you didn't comply

5   with that statement that you could be disciplined

6   from -- by the South Salt Lake City?

7       A     Yes.

8       Q     Tell me were you -- as a police officer

9   were you entitled or able to take people on patrol

10   with you?

11       A     Yes.

12       Q     And to do that did you have to follow

13   certain guidelines and principles to do that?

14       A     Are you talking about ride alongs,

15   civilian ride alongs?

16       Q     Yes.

17       A     Yes, there was a procedure.

18       Q     Is there something more than civilian ride

19   alongs?

20       A     I don't understand your question.

21       Q     Let me ask you this, could you take a

22   girlfriend with you on patrol?

23       A     Yes, that would be considered a ride

24   along.

25       Q     And to take a girlfriend with you would

1   you have to follow the policies and procedures of

2   South Salt Lake to do that?

3       A     Yes.

4       Q     And would one of those include obtaining a

5   waiver from that person?

6       A     Yes.

7       Q     And if you didn't receive that waiver were

8   you entitled to have them ride along with you?

9       A     The procedure was you get approval from

10   your immediate supervisor and you get the release form

11   or the permission form.

12       Q     And were there a limit -- was there a

13   limit as to how many ride alongs you could have in a

14   given month?

15       A     I don't recall a specific policy stating a

16   limit.

17       Q     But any time you had a ride along it was

18   your understanding that you would have a supervisor

19   know about it?

20       A     Correct.

21       Q     And would that include transporting people

22   in your police vehicle when you were off duty?

23       A     When I was off duty?

24       Q     Yes.

25       A     I don't know if that was ever addressed in

1  a policies and procedure.  Let me think about that for
2  a second.  I don't know if I can answer that.  I don't
3  know if I can answer that truthfully one way or the
4  other.
5       Q    So you don't know?
6       A    No, I don't know.
7       Q    And I should have mentioned this at the
8  beginning.  If you don't know the answer to a
9  question, I would prefer you to tell me that rather
10 than to guess so that I know what you know and what
11 you don't know.
12      A    Okay.
13      Q    So I appreciate you making that
14 distinction for me.  Thank you.  But you knew that
15 there were policies and procedures for ride alongs?
16      A    Yes.
17      Q    But if I understood your testimony
18 correctly you didn't know how many -- if you were
19 allotted a certain amount of ride alongs in a given
20 month?
21      A    Correct.
22      Q    And that would include -- you would have
23 to follow those policies and procedures if you had a
24 girlfriend that was riding with you?
25      A    Correct.

Page 73

1       Q    And you would have to follow that
2  procedure if you had a child or someone -- a relative
3  riding with you?
4       A    A relative -- any civilian ride along.
5       Q    Any civilian, including relatives?
6       A    Yes.
7       Q    And under that procedure one of your
8  supervisors would always know when there was a ride
9  along with you?
10      A    Correct.  I do have a question.  That
11 brings up a question in my head to make sure I answer
12 that correctly.
13      Q    Thank you.  What's your question?
14      A    Does that include taking a child from your
15 home to someplace else, dropping them off and then
16 proceeding to work or vice versa, going home from
17 work, picking up your child and proceeding home?  Are
18 you including that?
19      Q    Are you entitled to transport family
20 members to and from work?
21      A    That was I wouldn't say a common practice
22 but it was done by other officers without the ride
23 along permission form being signed.  I don't know if
24 there was supervision -- supervisor notification, but
25 I do know that occurred.  And I don't know what the

Page 74

1  policy is.  Like I said, I don't know one way or the
2  other what policy is as far as that goes.
3       Q    Is it your understanding one of the
4  reasons to have that policy that your supervisor
5  always know when you have a ride along is to protect
6  the police officer also?
7       A    Yes.
8       Q    In case there was false allegations made
9  or something along the lines the supervisor would say,
10 hey, I knew that that person was in the car?
11      A    Yes.
12      Q    Was there any type of policy with regard
13 to where the ride along would ride?
14      A    I don't know if there was a specific
15 policy where they ride, but common sense would put
16 them in the front seat.
17      Q    And when you would transport a suspect was
18 that different?
19      A    If -- for the most part, yes.
20      Q    Where would the suspect for the most part
21 ride?
22      A    In the back seat behind the cage.
23      Q    And the cage is to provide protection?
24      A    Correct.
25           (Whereupon, Deposition Exhibit No. 6 was

Page 75

1  marked for identification.)
2       Q    (BY MR. MORTENSEN)  I'm handing you
3  what's been marked as Deposition Exhibit Number 6.
4  And it appears to be a petition for protective order
5  filed by Deann Burnham.  Do you recall being served
6  with this?
7       A    Yes.
8       Q    And that was back in December of 2002?
9       A    Yes.
10      Q    It appears that there had been a breakdown
11 at some point in time when you had your psychological
12 evaluation to this point in time with regard to your
13 marriage.  Is that correct?
14      A    Yes.
15      Q    Do you have any understanding as to what
16 caused that breakdown?
17      A    Yes.
18      Q    What reasons are there for the breakdown
19 in your relationship with Deann Burnham?
20      A    She had accused me of sexually abusing my
21 daughter.
22      Q    When did she make that accusation?
23      A    The first allegation was in January or
24 February of 2000.  Is that right?  No, excuse me, it
25 would have been '99.

Page 76

1  claims of sexual abuse on your daughter?

2      A    Yes.

3      Q    Do you know what other investigations they

4  did into these events that were listed out?

5      A    I don't know the extent of their

6  investigation, no.

7      Q    Do you know who conducted the

8  investigation?

9      A    It might have been Keith Livingston. I'm

10  not quite sure. He did another one, I might be

11  getting that one confused.

12      Q    Was there an Internal Affairs file -- an

13  investigation done?

14      A    Yes.

15      Q    Do you know who South Salt Lake talked to

16  as far as investigating these allegations?

17      A    No.

18      Q    Did anyone ever come to you from South

19  Salt Lake and say, hey, if a woman flashes you while

20  you're on duty you need to make a report of that?

21      A    No.

22      Q    Did anyone ever come to you and say, if

23  someone gives you -- offers sex while you're on duty

24  you need to report that?

25      A    I don't recall any conversation, no.

Page 121

1      Q    Did anyone ever come to you and ask

2  whether these things had happened?

3      A    I don't recall if those questions came up

4  in the Internal Affairs investigation or not. They

5  very well may have but I don't recall one way or the

6  other. There should be record of whatever was

7  discussed from the IA investigation. I don't recall.

8      Q    You don't have a memory of someone from

9  South Salt Lake asking you about this encounter with

10  the first woman where she flashed you?

11      A    No. I couldn't tell one way or the other.

12  It very well could have happened, I don't remember if

13  it did or not.

14      Q    And again, you don't have any memory of

15  someone from South Salt Lake coming and asking you

16  about this woman from West Valley who had offered you

17  her number and offered sex?

18      A    I just recall who did the Internal Affairs

19  investigation. It was Sergeant Daniels. That's who

20  did it. That's who at least interviewed me. I don't

21  know who else was involved with the investigation.

22      Q    Is that Sergeant Scott Daniels?

23      A    Steve Daniels.

24      Q    Is Steve Daniels related to Scott Daniels?

25      A    Brothers.

Page 122

1      Q    Did anyone ever -- do you recall anyone

2  ever asking you from the South Salt Lake Police

3  Department whether you had penetrated the woman with

4  your finger?

5      A    I don't know if that question was brought

6  up.

7      Q    Would you remember that if someone asked

8  you that?

9      A    I don't know. It was kind of a scary time

10  for me. My job was on the line. I don't recall every

11  question that was proposed to me.

12      Q    Did anyone ever say -- from South Salt

13  Lake as a result of this come up to you and say, hey,

14  you need to be careful on giving people rides home?

15      A    I don't recall any specific conversations

16  with that, no.

17      Q    Were you ever given any instruction by

18  someone from South Salt Lake Police Department saying,

19  if you're going to have ride alongs -- if you're going

20  to give someone a ride you need to get a waiver from

21  them?

22      A    No, I followed the procedures when I gave

23  rides.

24      Q    In every instance you would follow the

25  procedures?

Page 123

1      A    For the most part, yes. I don't recall

2  previous -- as of the Internal Affairs investigation

3  we're talking about, I don't recall a time prior that

4  I didn't follow. I don't recall a time I didn't

5  follow the procedures.

6      Q    You would agree, would you not, that it

7  would violate the South Salt Lake department policy to

8  engage in any type of sexual conduct with a ride

9  along, even if that was your girlfriend, while on

10  duty?

11      A    While on duty, yes.

12      Q    Have you ever done that?

13      A    No.

14      Q    Have you ever had any sexual contact with

15  a ride along that was on a ride along once you went

16  off duty?

17      A    My wife.

18      Q    In your car?

19      A    In my car?

20      Q    Yeah.

21      A    I don't know.

22      Q    You don't remember?

23      A    I don't recall doing -- I mean, at the

24  time I didn't have a garage so if I did it was out in

25  the open and I can't imagine doing that out in the

Page 124

1    MR. MORTENSEN: Can you read the question
2  back.
3        (Whereupon, the question was read back by
4  the court reporter.)
5        THE WITNESS: Asked by?
6        MR. MORTENSEN: POST.
7        THE WITNESS: I couldn't testify one way
8  or the other. It very well could have happened. But
9  like I said, I don't recall specific questions.
10       MR. MORTENSEN: We're at a good time. Do
11 you want to take a break and grab lunch and come back.
12       (Whereupon, a recess was taken.)
13    Q   (BY MR. MORTENSEN)  We've taken a break
14 for lunch and we'll jump back into this. Before we do
15 it I'd like to -- I have a few questions about some
16 documents that I'd like to ask with regard to the ride
17 along policy. Let me have you mark this as Exhibit 9.
18       (Whereupon, Deposition Exhibit No. 9 was
19 marked for identification.)
20    Q   (BY MR. MORTENSEN)  Mr. Burnham, I'd ask
21 you to tell me if you've seen this document before?
22    A   Yes.
23    Q   And does that appear to be a true and
24 accurate copy of the ride along program of South Salt
25 Lake that was in place when you were serving as a

Page 129

1  police officer there?
2    A   It appears to be the same.
3    Q   Okay. And then there's the waiver and
4  release indemnity agreement at the back. Do you
5  recognize that document?
6    A   Yes.
7    Q   And under this policy under Paragraph 8
8  all observers were to sign and agree to the waiver of
9  liability?
10   A   Yes.
11   Q   And did you also -- looking at
12 Paragraph 11 did you have an understanding that each
13 officer was limited to two ride alongs per month
14 unless authorized by the Chief of Police?
15   A   That's what it says here, yes.
16   Q   Was that your understanding also?
17   A   At the time, no.
18   Q   Has that policy changed?
19   A   It changed while I was a police officer.
20 I don't recall exactly when that was put into place.
21 I don't recall when it was put into place.
22       (Whereupon, Deposition Exhibit No. 10 was
23 marked for identification.)
24   Q   (BY MR. MORTENSEN)  I've handed you
25 what's been marked as Exhibit 10. Do you recognize

Page 130

1  this document?
2    A   It appears familiar, yes.
3    Q   Is that a Salt Lake Police Department
4  document?
5    A   Yes.
6    Q   Let me just find my copy here. And while
7  you were employed with South Salt Lake were you able
8  to review this and become familiar with it?
9    A   If it was available, yes. We had several
10 documents that we reviewed.
11   Q   And under this policy it says that
12 Sergeants or above will authorize a ride along?
13   A   Yes.
14   Q   Do you ever recall getting permission --
15 back on this other policy -- ever getting permission
16 from the Chief to have a ride along?
17   A   The way chain of command works we always
18 go to the Sergeant first. I always talked to the
19 Sergeant.
20   Q   So if you wanted to do more than two ride
21 alongs in a month would you go to the Sergeant still
22 if it was more than two?
23   A   Yes.
24   Q   And then you would leave it to the
25 Sergeant to ask the Chief of Police?

Page 131

1    A   Yes.
2    Q   And this document that I just handed you
3  makes a distinction between family members or friends.
4  Those are restricted to two a month, while the earlier
5  document seemed to restrict ride alongs to two per
6  month. Do you know, was there such a distinction in
7  the police force?
8        MR. PLANT: Alan, you're distinguishing
9  between Exhibit 9 and Exhibit 10; correct?
10       MR. MORTENSEN: Yes. Thank you.
11       THE WITNESS: I don't recall any specific
12 discussion as to what it distinguished between.
13       (Whereupon, Deposition Exhibit No. 11 was
14 marked for identification.)
15   Q   (BY MR. MORTENSEN)  You've been handed
16 what was marked as Deposition Exhibit 11. Do you
17 recognize this document?
18   A   When you say this document, are you
19 referring to --
20   Q   Exhibit 11.
21   A   To both of them or just the top one?
22   Q   To both of these. Excuse me, I should
23 have referred you just to the top one.
24   A   Yes.
25   Q   And did you have an opportunity while you

Page 132

GARY JASON BURNHAM                                                         April 23, 2007

1    Q    Do you recall that?
2    A    Yes.
3    Q    Was that letter of caution as a result of
4  negotiation with POST?
5    A    No.
6    Q    And do you know if you had any right of
7  appeal to appeal the letter of caution?
8    A    I believe there is an appeal process in
9  place.
10   Q    Did you take any steps to appeal the
11  letter of caution that was issued?
12   A    No.
13   Q    Did you agree with the letter of caution?
14   A    No.
15   Q    And was it your understanding that South
16  Salt Lake was aware of the POST investigation?
17   A    Yes, they were aware of it.
18   Q    And at the top of Deposition Exhibit 17
19  there's a CC personnel file. Do you know if this
20  letter of caution was put into your personnel file?
21   A    I don't know what was put in my personnel
22  file.
23   Q    Did the letter of caution -- how did that
24  affect the Internal Affairs investigation?
25   A    The Internal Affairs investigation was
                                                    Page 161

1  investigation, yes.
2    Q    Did anyone caution you, even if it was off
3  the record, to be careful, change your conduct?
4    A    I talked with Keith Livingston. I don't
5  recall exact words. I don't know -- it seems like I
6  did have a talk with him about this. I don't recall
7  him cautioning me about my conduct, but more of just
8  be really careful. That's just kind of the general
9  feeling that I can remember.
10   Q    Keith Livingston again is a Sergeant?
11   A    Was a Sergeant, yes.
12   Q    Was a Sergeant. Do you know Scott
13  Daniels?
14   A    Yes.
15   Q    How do you know him?
16   A    He was an employee with South Salt Lake
17  Police Department.
18   Q    Was he a friend of yours?
19   A    Yes.
20   Q    Are you aware that there was a lawsuit
21  brought against Officer Daniels as a result of an
22  incident -- an alleged incident that happened back in
23  April of I think it was 2005?
24   A    Yes.
25   Q    And you were with the South Salt Lake
                                                    Page 163

1  complete by the time this came about.
2    Q    So they had -- South Salt Lake had already
3  finished its Internal Affairs investigation?
4    A    Yes.
5    Q    And what was the result of that?
6    A    It was dismissed. I don't recall the
7  exact findings at the end but it was dismissed.
8    Q    Were you given any type of discipline from
9  South Salt Lake?
10   A    No.
11   Q    And with regard to the criminal proceeding
12  you entered into a plea. Did you have to pay a fine?
13   A    Yes.
14   Q    So you paid a fine and entered into a plea
15  in abeyance on the criminal proceeding and you were
16  issued a letter of caution from POST. But if I
17  understood you correctly nothing was done by South
18  Salt Lake as a result of this?
19        MR. PLANT:  Objection. It misstates his
20  testimony regarding nothing.
21   Q    (BY MR. MORTENSEN)  There was no
22  discipline carried out by South Salt Lake?
23   A    There was no discipline, correct.
24   Q    Did anyone talk to you about it?
25   A    There was an Internal Affairs
                                                    Page 162

1  Police Department at that point in time?
2    A    Yes.
3    Q    Were you on duty when this incident
4  happened?
5    A    No.
6    Q    Did you find out about this incident?
7    A    It was -- he was put on administrative --
8  everybody knew about it.
9    Q    He was put on administrative leave?
10   A    Yes.
11   Q    When was he put on administrative leave?
12   A    I don't know.
13   Q    Did you ever talk to him about this event?
14   A    No. Not about the event. When I talked
15  to him -- I did talk to him after he was put on
16  administrative leave just checking on his general
17  welfare, how he was doing, if I could do anything for
18  him.
19   Q    Did he say anything about the truthfulness
20  of the allegations that were brought?
21   A    He said if I recall right -- he did say it
22  was just garbage and lies and a bunch of gold diggers.
23   Q    Were you given any type of -- well, did
24  anyone make an official statement to you from the
25  police department about any change in policies or
                                                    Page 164

1 correct?

2     A     Correct.

3            (Whereupon, Deposition Exhibit No. 24 was

4 marked for identification.)

5            MR. PLANT:  Where did you get this?  I'm

6 just curious.

7            MR. MORTENSEN:  From your files.  I think

8 it's in Internal Affairs investigation.

9            MR. PLANT:  It bares the Bates number

10 indicative from coming from the Salt Lake files.

11           MR. MORTENSEN:  Right.

12           MR. PLANT:  My point is, you've never seen

13 the copy that she was issued, Erin's, of the citation?

14           MR. MORTENSEN:  I think I have.

15           MR. PLANT:  Let me be clear on this.  The

16 copy that was given to her, have you ever seen that?

17           MR. MORTENSEN:  I believe so, and I

18 believe it was in our initial disclosures.  Have you

19 not seen it?

20           MR. PLANT:  Well, we'll go through that

21 later.  I just wanted to make sure this isn't that.

22 This is the one from our files?

23     Q     (BY MR. MORTENSEN) Correct.  You've been

24 handed what's been marked Deposition Exhibit Number 24

25 and the citation of Erin Vale Nielson is on the bottom

Page 181

1 of this document.  Is that your handwriting?

2     A     Yes.

3     Q     There's a fingerprint on that citation.

4 Did you take that fingerprint?

5     A     Most likely, yes.

6     Q     And did you have a fingerprinting kit in

7 your car?

8     A     I have a little tiny ink pad about two

9 inches by one inch that I used to fingerprint criminal

10 citations, and I used that.

11     Q     And on this citation there's -- Erin's

12 address is listed.  Do you see that?

13     A     Yes.

14     Q     Where did you obtain that information?

15     A     I don't recall where I obtained that

16 information.  If she gave that to me later on or if I

17 found that on one of her warrant records.

18     Q     And there's a phone number listed there.

19 Do you know where you got that information?

20     A     I don't recall.

21     Q     So you were able to obtain though from a

22 warrant record what her address and her phone number

23 were if she didn't provide it herself?

24     A     Well, at least her address.  I don't

25 recall the phone number.  I don't think you can get

Page 182

1 phone numbers off warrant informations.

2     Q     And there is a -- in the violation section

3 it says, positive alcohol less than 21, and then in

4 parenthesis it says .194.  Do you see where I'm

5 referring to?

6     A     Yes.

7     Q     What does the .194 mean?

8     A     .194 is what the PBT shows.

9     Q     And is that a high level of blood alcohol?

10     A     Yes, that would be high blood level.

11     Q     What is the level for blood alcohol where

12 you're not entitled to drive anymore under the laws of

13 the State of Utah?

14     A     The -- there is no per se statute

15 saying -- it's -- 08 is the legal limit, although you

16 can still be issued a DUI under the limit of .08,

17 depending on your ability.

18     Q     So between -- can you issue a citation if

19 they're less than .04?

20     A     What kind of citation?

21     Q     A DUI.

22     A     Yes.

23     Q     So if they appear to be impaired or you

24 have other indicia of intoxication, even if they blow

25 below a .04 you can issue a citation?

Page 183

1     A     Correct.

2     Q     For a DUI?

3     A     Correct.

4     Q     Why did you write the blood level

5 alcohol -- or the blood alcohol level on her citation?

6     A     Whenever we're using a PBT I always wrote

7 down what it registered to show that it was a positive

8 indication of alcohol.

9     Q     And at least from the Breathalyzer there

10 at the scene, assuming that it's accurate, she had

11 over twice as much alcohol in her system as did Sean

12 Hadley.  Is that fair?

13     A     If it were accurate, yes.

14     Q     Based on what you've documented in the

15 citations that would be -- at least from the

16 documented evidence on the citation that would be the

17 case, would it not?

18     A     The answer is yes, but with clarification.

19 As previously stated, portable breath testers the

20 level that they register are not court admissible and

21 I already went through those reasons.  So according to

22 the levels shown by the PBT, yes.  However, the levels

23 aren't legally admissible.

24     Q     You knew that Erin was drunk, did you not?

25     A     I knew she had been drinking alcohol.

Page 184

GARY JASON BURNHAM          April 23, 2007

1     Q    Did you have -- you knew that she had been
2 drinking alcohol and you knew that the Breathalyzer
3 came out at .194?
4     A    Correct.
5     Q    Did she have other indicia of intoxication
6 at that point in time?
7     A    I could smell alcohol on her.  Her speech
8 was not slurred.  When she walked and stood there was
9 no swaying.  There were no other typical indications
10 of someone being intoxicated.  When I talked to her
11 her eyes also seemed -- or appeared to be normal.
12     Q    Would you test her eyes by looking at them
13 directly?
14     A    If somebody's had enough to drink and
15 they're intoxicated and you're looking at them in the
16 eyes and you're talking to them they move side to side
17 and you can actually see nystagmus with them just
18 talking.  Nystagmus is the involuntary jerking of the
19 eye when it's going side to side.  And you can see
20 that in an intoxicated person just by talking to them.
21     Q    Did you see that with Erin?
22     A    No, I did not.
23     Q    Did you test for that?
24     A    Not specifically test.  A specific test I
25 would have them follow an object back and forth.  But

Page 185

1 as stated before, a lot of times if I'm just talking
2 to an intoxicated person you can see that because
3 they'll look to the side.  They'll hardly ever look
4 you straight in the eye, they'll look side to side and
5 move around.  And I did not see any nystagmus in her
6 eyes.
7     Q    When you pull someone over for a suspected
8 DUI and you do those specific types of tests you
9 referenced would you videotape that?
10     A    I would videotape the test, yes.
11     Q    And again, there was no video tape of this
12 event -- or this citation -- issuing of a citation and
13 arrest?
14     A    Correct.
15     Q    Back on Exhibit 19, Page 2, she admitted
16 to you that she had been drinking; is that correct?
17     A    Yes.
18     Q    And you knew that she was 19?
19     A    I knew after the fact she was 19.
20     Q    After this event was over or after the
21 initial stop?
22     A    I don't recall at what point I discovered
23 she was 19.
24     Q    It was sometime during the arrest and
25 issuance of the citation, was it not?

Page 186

1     A    Yes, it was.
2     Q    You would have had to have known that in
3 order to cite her for alcohol consumption under the
4 age of 21?
5     A    Yes.
6     Q    Down to the next paragraph you state that
7 she was crying.  Do you recall Erin crying?
8     A    Yes.
9     Q    Was she crying hysterically or was it a
10 quiet sob?  Describe for me what you recall about the
11 crying.
12     MR. PLANT:  And you're talking about the
13 time after the stop and he's now seeing her again?
14     MR. MORTENSEN:  Correct.
15     THE WITNESS:  She was approximately
16 50 yards away from me.  I was in my patrol car and I
17 had my window down and I could hear her crying.  It
18 wasn't a soft crying.  It was rather loud.
19     Q    (BY MR. MORTENSEN)  And you had asked her
20 what was going on and she had reported to you that her
21 life sucked?
22     A    Yes.
23     Q    And that she told you she had no place to
24 sleep?
25     A    Yes.

Page 187

1     Q    And that she didn't have a home?
2     A    Correct.
3     Q    And that she starves?
4     A    Correct.
5     Q    And then she started to walk away?
6     A    No.  She was still there.
7     Q    Okay.  Let me read what you said.  She was
8 crying.  I asked her what was going on and she said
9 that her life sucks.  She has no place to sleep, she
10 doesn't have a home, she starves and whatnot, so she
11 started walking away.
12     A    I think it was asked earlier if this was
13 concerning the conversation I had with her after she
14 was released.  She did say something to that effect
15 before she was released, I released her, she walked
16 away.  So there's just some clarification that needs
17 to happen there.
18     Q    So after the initial stop after you had
19 done all of your -- the issuance of the citation,
20 et cetera, she started walking away?
21     A    Correct.
22     Q    She didn't make any -- she didn't ask to
23 go to your house or your apartment or for food or
24 anything along those lines?
25     A    Now you're talking immediately after I

Page 188

1  released her for the citation?
2      Q      Correct.
3      A      That is correct, she did not.
4      Q      And then you drove out to 5th East and you
5  saw her again and she was still crying?
6      A      Yes, that's when I could hear her crying.
7  As I stated earlier I thought you were talking about
8  that part of the incident.
9      Q      And you asked her if she was hungry and
10  she wanted a meal and she said no.  Is that correct?
11     A      I believe so.  She did state she was
12  hungry.  I asked her if she wanted some food.  I think
13  she did say no at that time.
14     Q      And then you asked her do you have a place
15  to stay and she said no.
16     A      Correct.
17     Q      And then you asked her if she wanted a
18  warm bed and a shower tonight and she answered yes.
19     A      Correct.
20     Q      So it was you that had suggested the warm
21  bed and shower and not her?
22     A      There's more to that conversation right
23  there, but yes.
24     Q      And I apologize, I'm just going to go
25  through this and we'll jump back and forth, depending

1  on where we're at.  Once you got to your apartment you
2  asked her if she wanted to sleep on the bed or the
3  couch and she said a bed.
4      A      Where are you if I can ask?
5      Q      Again on Page 2.
6      A      Okay.
7      Q      At the very bottom.  It says here, do you
8  want to sleep on a bed or on the couch and she said a
9  bed.
10     A      Yes.
11     Q      And it says, I said okay, so I gave her
12  some clean clothes to get into.  You gave her clothes?
13     A      Yes.
14     Q      What clothes did you give her?
15     A      A pair of red sweats and a T-shirt.  I
16  think it was a white T-shirt.
17     Q      Were the sweats yours?
18     A      Yes.
19     Q      What was the purpose for giving her
20  clothes?
21     A      Something comfortable for her to sleep in.
22     Q      And it says that she slept on the bed and
23  you slept out on the couch.
24     A      Eventually, yes.
25     Q      It says you woke up at 6:15 and got ready

1  for work?
2      A      Yes.
3      Q      What time was the arrest made of Erin?  Do
4  you recall?
5      A      I don't recall but it should say on the
6  citation.  2:47 is when it says.  I think that was the
7  time of the stop.
8      Q      So from 2:47 to 6:15, that would be what,
9  three and a half hours?
10     A      No, that's actually almost four hours.
11  Three hours and 45 minutes approximately -- or excuse
12  me, yeah, 3:45.  Yeah, that's right.
13     Q      From 3:45 to 6:15?
14     A      I'm confusing myself, I'm sorry.  I
15  stopped her at 2:47 in the morning.
16     Q      Right.  And I just want to define the time
17  frame that we're dealing with.  You stopped her at
18  2:47.
19     A      Yes.
20     Q      And then you woke up at 6:15?
21     A      Correct.
22     Q      And is that -- when you told the
23  investigators that you woke up at 6:15 to go to work
24  was that true?
25     A      Yes.

1      Q      You were also asked later on if it looked
2  like Erin needed a shower, if she was a transient or
3  homeless person, and you said she didn't smell bad.
4      A      That is correct.
5      Q      And how did you determine how she smelled?
6      A      My nose.
7      Q      I mean, at what point in time did you
8  smell her?
9      A      You can smell somebody standing by them.
10  I didn't go up to her and sniff her or anything.  Just
11  general appearance.
12     Q      You smelled alcohol on her though?
13     A      You can smell alcohol on her, yes.
14     Q      And could you smell alcohol on her when
15  you got to your apartment?
16     A      I have a very sensitive nose to alcohol.
17  I could smell alcohol on her, yes.
18     Q      How about the next morning, could you
19  still smell alcohol on her?
20     A      I don't recall if I smelled alcohol on her
21  or not.
22     Q      But once you got to your apartment you
23  could still smell alcohol on her?
24     A      Yes.
25     Q      Could you smell alcohol on her when she

1  got in your bed?

2     A    Yes.

3     Q    On Page 4 you state that she got on your

4  computer?

5          MR. CONDER:  Is that 0386?

6     Q    (BY MR. MORTENSEN)  0387.  She got on your

7  computer at some point in time?

8     A    Yes.

9     Q    And you said that she checked her e-mails

10  and that she read a poem from one of her friends?

11    A    Yes.

12    Q    Do you recall what the people talked

13  about?

14    A    No.  It was actually a nice poem though.

15  I remember that.

16    Q    When she was on the computer could you

17  still smell the alcohol on her?

18    A    I was sitting on my bed, she was on my

19  computer.  We would have been approximately as far

20  apart as we are, so ten feet maybe.

21    Q    And could you smell alcohol?

22    A    I don't recall smelling it at that time,

23  no.

24    Q    And you were sitting on your bed?

25    A    I was sitting on my bed.

1     Q    Did you have Tazmanian Devil sheets?

2     A    Yes -- no, Tazmanian Devil comforter.

3     Q    Comforter.  At any point in time did you

4  go check your computer to see if you could retrieve

5  the e-mails that she looked at?

6     A    No.

7     Q    The computer that was in your room that

8  night, where is it at now?

9     A    I gave it to charity, I think DI.

10    Q    When did you give it to DI?

11    A    Maybe a year, year and a half ago.

12    Q    So it was after you knew about these

13  allegations?

14    A    Yes.

15    Q    And did you talk to your attorney or to

16  anyone before you did that?

17    A    No.  Nobody said anything about it so I

18  didn't think it was relevant.

19    Q    Did you take it to DI before or after the

20  lawsuit was filed against you?

21    A    I don't recall.  It wasn't a factor in my

22  taking it to DI, I know that.

23    Q    It was?

24    A    It wasn't a factor.  I didn't think I

25  needed to get rid of it.

1     Q    So there was never any efforts made on

2  your part to retrieve any of the e-mails that Erin may

3  have pulled up?

4     A    No.  I don't know how to do that anyway.

5     Q    And it goes on to say that you clocked off

6  duty about 3:40-ish or so?

7     A    Correct.

8     Q    So that was an hour after -- an hour or so

9  after your initial stop of Erin?

10    A    Correct.

11    Q    And you did that just as you were -- it

12  says, I was just getting here or just about here when

13  I clocked out.  Were you talking about your apartment?

14    A    Yes.

15    Q    So when you picked up Erin and invited her

16  to come home with you you were still on duty?

17    A    Correct.

18    Q    And you were in a police car?

19    A    Yes.

20    Q    And you had your police officer uniform

21  on?

22    A    Yes.

23    Q    And you were earning income from the South

24  Salt Lake Police Department at the time?

25    A    Yes.

1     Q    Did you consider Erin a ride along?

2     A    No.

3     Q    What did you consider her?

4     A    I was transporting her.

5     Q    To where?

6     A    To my apartment.

7     Q    And do you have transportation -- or

8  transport policies with South Salt Lake?

9     A    I believe there are some transport

10  policies.

11    Q    Are you allowed to transport suspects or

12  citizens to your apartment?

13    A    I don't believe there's a policy stating

14  that you cannot.

15    Q    But you considered this a transport?

16    A    I was giving her a ride.  I would consider

17  that a transport.

18    Q    Did you call your Sergeant or the

19  supervising officer before you did that?

20    A    No.

21    Q    Why not?

22    A    Because it was two blocks from my house

23  and I was going off duty right then.

24    Q    And when you're transporting a female are

25  you supposed to call dispatch and let them know when

GARY JASON BURNHAM                                                                          April 23, 2007

1  you're clocking out?
2       A    What do you mean by clocking out?
3       Q    Or when you're dropping the female person
4  off?
5       A    Yes.
6       Q    Did you do that?
7       A    No.
8       Q    Did anyone at South Salt Lake know that
9  you were transporting Erin?
10      A    No.
11      Q    Had you ever done that before?
12      A    No.
13      Q    Never transported an intoxicated person to
14 your apartment with your police car?
15           MR. CONDER:  That's your characterization;
16 right?
17           MR. MORTENSEN:  No, it's his.
18           THE WITNESS:  I wouldn't call her
19 intoxicated.  And no, I've never -- is that what
20 you're insinuating, that she was intoxicated? That's
21 what it sort of sounds like to me and I don't want to
22 answer it that way.
23      Q    (BY MR. MORTENSEN)  Let me ask you this,
24 is there a difference between transporting someone and
25 a ride along?

Page 197

1       A    Yes, there is a difference.
2       Q    What's the difference?
3       A    A ride along is there to observe police
4  activities.  They go on normal activity calls and
5  stuff like that.
6       Q    And a transport, my understanding is
7  you're transporting someone for their physical safety
8  or you're transporting them to jail?
9       A    You're giving them a ride somewhere.
10      Q    And you're transporting them as part of
11 your police duties?
12      A    Correct.
13      Q    And part of a transport is to provide for
14 safety for the person that you're transporting?
15      A    That would be fair to say, yes.
16      Q    Have you ever transported an intoxicated
17 person to jail?
18      A    Yes.
19      Q    And under what circumstances have you done
20 that?
21      A    If they are a danger to themselves or to
22 other people and there's nowhere else for them to go.
23      Q    And what makes that an endangerment to
24 themselves or to other people?
25      A    If someone can't walk I think I would

Page 198

1  consider that.  Just a bunch of various factors.
2  There's not an A, B, C, D, E, F, G.  If somebody
3  appears like they're going to be in danger themselves.
4  They're going to accidentally get hurt, wander out
5  into the road, get struck by a car.  If they're at
6  someplace and because they're intoxicated they're
7  going to start a fight with somebody.  There are a
8  whole bunch of the circumstances where that would
9  qualify.
10      Q    And it gives them a place where they might
11 not have another place to go it gives them a place to
12 sober up?
13      A    Correct.
14      Q    And be safe?
15      A    Correct.
16      Q    And again, in this case you didn't feel
17 like Erin was an endangerment to herself?
18      A    Correct.
19      Q    But you did understand that she had
20 nowhere else to go?
21      A    According to what she said, yes.
22      Q    Now who backed you up when you called for
23 backup on the initial stop?
24      A    Aldo Montes and Sergeant Carlson.
25      Q    And did they both respond?

Page 199

1       A    That's who responded when I asked for
2  backup, yes.
3       Q    Were they together?
4       A    No, separate vehicles.
5       Q    So there were three police cars there?
6       A    Briefly, yes.
7       Q    And were they both in uniform?
8       A    Yes.
9       Q    And did you get a call after you had
10 stopped Erin and had released her to walk home?
11      A    No.
12           MR. CONDER:  You mean a call on the radio
13 or --
14           MR. PLANT:  I don't understand that
15 question.
16      Q    (BY MR. MORTENSEN)  Were you dispatched
17 to any other -- thank you.  Were you dispatched to any
18 other crime scene or to respond to any other event?
19      A    No, I was not.
20           MR. PLANT:  Just for clarification, after
21 he let Erin go and before he went home was he put out
22 on any other calls?  That's what you were asking;
23 right?
24           MR. MORTENSEN:  Right.
25           MR. PLANT:  And that's what you

Page 200

1  understood?

2          THE WITNESS:  Correct.

3     Q    (BY MR. MORTENSEN)  And at any point after

4  you picked up Erin to take her home, between the time

5  that you picked her up and got to your apartment did

6  you receive any dispatch to respond to any other

7  events?

8     A    No, I did not.

9     Q    Let me have you turn to Page 6.  You were

10 asked by one of the investigators, do you know how old

11 she was -- or you asked the investigator, do you know

12 how old she was?

13         And the investigator answered, like 19.

14 Do you have any history -- if she lives around here or

15 if she had family nearby?

16         And you answered, like she said that her

17 family lived at like 27th and 7th East but said that

18 they didn't like her and didn't welcome her there.

19         Did she tell you that she lived at 27th

20 and 7th East?

21    A    I think that was from the citation she

22 said that's where some of her family lives.  I believe

23 that's what she said.

24    Q    Did you ever attempt to contact her

25 family?

1     A    No, I did not.

2     Q    Did you call -- ever call dispatch and ask

3  them to attempt to contact her family?

4     A    I don't recall if I did or not.

5     Q    Now you took a -- you earlier testified

6  that you took a woman home to West Valley who was

7  exiting a bar or leaving a bar and that you had -- you

8  had gotten permission to do that?

9     A    Yes.

10    Q    Why didn't you do that in this case?

11    A    Because she was going to go sleep at my

12 house.

13    Q    And you knew that that was improper?

14    A    Yes.

15    Q    And you knew that you wouldn't be given

16 permission to do that?

17    A    Correct.

18    Q    And you wanted her to go sleep at your

19 house?

20    A    No, I didn't care where she slept.  I just

21 wanted her to be safe for the night.

22    Q    So you were willing to break department

23 policy in order to provide her a safe place to sleep?

24    A    Yes.

25    Q    At some point in time after she got to

1  your apartment you gave her the clothes to go change

2  into?

3     A    Yes.

4     Q    And where did she change?

5     A    In the bathroom.

6     Q    Were you still in uniform when she went in

7  to change her clothes?

8     A    I believe I was.

9     Q    At any point in time before she got into

10 your bed did you change out of your uniform?

11    A    Yes.

12    Q    When was that?

13    A    Immediately after she changed.

14    Q    And where did you change?

15    A    I believe I changed in the bathroom as

16 well.  Or I may have changed in my bedroom while she

17 was in the bathroom changing.  I don't recall.  It was

18 right around the exact same time she changed.

19    Q    Let me ask you to turn to Page 9.  In the

20 middle of that page you state in the statement that

21 Erin started snoring.  Do you recall her snoring that

22 night?

23    A    Yes.

24    Q    And just so the record's clear, at some

25 point in time -- there was a point in time that you

1  were in bed with Erin?

2     A    Yes.

3     Q    Did you hear her snore before you got in

4  bed with her?

5     A    I was in bed first.  She got into bed with

6  me and she did not snore until after I left the bed.

7     Q    But you had heard her snore?

8     A    Yes.

9     Q    Did Erin ever tell you how much she had

10 had to drink?

11    A    I don't remember.

12    Q    You had said that you were in bed with her

13 at some point in time.  Could you smell alcohol on her

14 then?

15    A    Yes.

16    Q    Did that indicate in your mind that she

17 was still under the influence of alcohol?

18    A    I never said she was under the influence

19 of alcohol at any time.

20    Q    In your mind did you think she was under

21 the influence of alcohol because of the smell of

22 alcohol?

23    A    No.

24    Q    Did you think she had spilled it on her?

25    A    I knew she had been drinking it.

1 can't go there because of this.

2 And I said well, I do live close by here

3 if you want a warm place to sleep and something to

4 eat. If you want you can stay there for the night.

5 She said okay.

6 Q And that was before she got in the car?

7 A That was before she got in the car.

8 Q On Page 13 of this statement at the

9 beginning you were asked by Sergeant Oliver, she

10 willingly -- did you have to coax her to get into the

11 car?

12 And you answered, huh-uh, negative

13 response.

14 And then Sergeant Oliver asked, she didn't

15 resist?

16 No. I just asked her if she needed --

17 And then you were interrupted and it says,

18 you didn't tell her that you were going to take her

19 home?

20 And you said no. She asked me if I was

21 going to lock her up and I said no, I'm not going to

22 lock you up. My apartment is right around the corner.

23 You're more than welcome to stay there for the night.

24 And I said, I'm off duty. I get off duty right now.

25 And I can so -- yeah, she knew it was my apartment.

1 So it's your understanding that it was

2 clear to her that before she got in the car that you

3 were going to take her to your apartment?

4 A Yes.

5 MR. MORTENSEN: Let's change the tape.

6 (Whereupon, an off-the-record discussion

7 was held.)

8 Q (BY MR. MORTENSEN) Let me have you again

9 look at Deposition Exhibit 19 on page 13, 0396 Bates

10 number. You were asked at the bottom by Officer

11 Oliver -- Sergeant Oliver, no inappropriate touching

12 or snuggling with her or anything like that you were

13 asked.

14 And then you answered, I sat on the bed

15 for -- like I said, she got off the internet, jumped

16 in there. Jumped in the bed. I was sitting on the

17 bed. I was sitting on top of the cover on the far

18 side. You see -- my bed sits --

19 You would agree at that point in time that

20 Sergeant Oliver had given you a chance -- had asked

21 you a question where you could have discussed with him

22 any sexual touching that happened between you and my

23 client that night?

24 A Yes.

25 Q And you did not reveal that?

1 A Correct.

2 Q And you're a police officer?

3 A I was.

4 Q POST certified at the time?

5 A Yes.

6 Q Did you have an understanding that as a

7 police officer when a criminal investigation is being

8 done that you have an obligation to be -- to answer

9 honestly?

10 MR. CONDER: Object as to form of the

11 question. He was also a suspect at the time.

12 Q (BY MR. MORTENSEN) Well, let me ask you

13 this, does a suspect have a right to lie?

14 A A right?

15 Q Yeah.

16 A He has the freedom of choice to lie.

17 Q Okay. And is it appropriate for a suspect

18 to lie as opposed to pleading the Fifth Amendment if

19 he doesn't want to answer the question?

20 A Pleading the Fifth would be more

21 appropriate.

22 Q Does a suspect when asked questions by an

23 investigating police officer or an investigating

24 officer have an obligation, a legal obligation -- in

25 your understanding as a POST certified police officer,

1 did you have a legal obligation to give honest

2 answers?

3 A If I answered, yes.

4 Q Let me have you turn to Page 20. At the

5 top of Page 20 you make reference -- you say, I don't

6 even know why I was put on admin leave and then you --

7 well, I can just guess by what you are saying.

8 Had you been put on administrative leave

9 prior to these investigators coming to your apartment?

10 A Yes.

11 Q How did you find out about that?

12 A Sergeant came and told me to meet him at

13 the office, and I believe it was Joe Bennett put me on

14 administrative leave.

15 Q What Sergeant came?

16 A Wersland.

17 Q How do you spell that?

18 A W-E-R-S-L-A-N-D.

19 Q And did he tell you why you were on

20 administrative leave?

21 A He didn't tell me I was on administrative

22 leave. He told me to go to the office.

23 Q Did -- Joe Bennett was the one that put

24 you on administrative leave?

25 A I believe it was Joe Bennett.

1  Q   Did he tell you why?

2  A   No.

3  Q   Tell me about that discussion.

4  A   He said you're on administrative leave.

5  There wasn't much of a discussion.  He handed me

6  papers and I turned in my gun and my badge and --

7  Q   You didn't ask him why?

8  A   Yeah, I asked him why.

9  Q   What did he say?

10  A   He wouldn't answer.

11  Q   Did you already kind of know?

12  A   I guess I had a feeling.

13  Q   It was from what had happened the night

14  before?

15  A   Yes.

16  Q   Here in this interview you said, I didn't

17  even know why I was put on admin leave.  But it sounds

18  like you did have at least some idea as to why you

19  were put on admin leave?

20  A   I had an idea but I did not know why.

21  Q   And then you state, I'll take a lie

22  detector test.  Do you remember saying that?

23  A   Yes.

24  Q   It was you that brought up the lie

25  detector test, was it not?

Page 217

1  A   Yes.

2  Q   No investigator had suggested a lie

3  detector test prior to that time, had they?

4  A   No.

5  Q   And then you said, I didn't do anything.

6  You weren't being truthful at that point in time, were

7  you?

8  A   Correct.

9  Q   And then you were informed that -- well,

10  let me read it.  The way it was described is that she

11  didn't claim she was penetrated by a penis but

12  digitally, fingers, and that she woke up that way with

13  her top pushed up and --

14  Basically you're over the top.

15  You're over the top.

16  And you say no.

17  You're fondling her breasts and messing

18  with her vagina with the other --

19  You're messing with your hand with her.

20  And then I think they got the initials

21  wrong but it says, no, absolutely not.  I'll take a

22  lie -- I promise, I'm telling you right now, I'll take

23  a lie detector test.  Take DNA, whatever you have to

24  do.  Never.  Nothing ever happened.

25  You weren't being honest there, were you?

Page 218

1  A   Not completely honest, no.

2  Q   How were you being honest?  What part of

3  that statement's being honest?

4  A   I was not fondling her breasts with one

5  hand and messing with her vagina with the other.  She

6  did not wake up with me on top of her.  I did not

7  penetrate her digitally.  She said that she woke up

8  with her shirt pushed up.  That is not true.  Like it

9  said -- not over the top like it says.

10  Q   Tell me --

11  A   And then she claims she's been raped.

12  Absolutely not true.  There were several things that

13  were not true but there were things that were true --

14  or that I had -- sorry, scratch that.

15  Q   Let me have you turn to Page 22.  At the

16  bottom you were asked, was she nice to you the whole

17  time?

18  And then you say, yeah, very offish.

19  What did you mean by very offish?

20  A   Kind of shy.  She -- sometimes I would

21  have to ask her a question twice.  She would just kind

22  of stare at me like she was -- like she didn't want to

23  answer it or she didn't answer it so I would ask it

24  again.  Offish meaning like not all the time totally

25  engaged in the conversation.

Page 219

1  Q   Did that indicate to you that maybe she

2  was more intoxicated than you thought?

3  A   Usually when people are intoxicated they

4  give that blank stare like they don't comprehend.  It

5  wasn't like that.  It was as if she were shy and she

6  just didn't talk a lot.  Kind of introverted.

7  Q   So she was introverted and not flirty?

8  A   At that time, no -- or you are correct, at

9  that time.

10  Q   Let me have you look at Deposition

11  Exhibit 22.  Do you see on page SSL0330?

12  A   Yes, I see the page.

13  Q   And again, on Deposition Exhibit 23 you've

14  made some clarifications to this narration of what

15  Sergeant Oliver reported you told him ultimately had

16  happened here?

17  A   Yes.

18  Q   In this statement it says in the second

19  paragraph, again on Page 0330, Jason stated that

20  everything he had stated in prior interviews about

21  what had happened is the truth.  He states that he was

22  not telling the truth about what happened after the

23  victim was done playing on his computer.  And then it

24  goes through a fairly extensive narrative of what you

25  reported had happened.  During this first interview

Page 220

GARY JASON BURNHAM                                                                April 23, 2007

1  that you had with Sergeant Oliver you never told him
2  any of this information, did you?
3      A    Correct.
4      Q    You never told him that Erin had gotten in
5  bed with you as opposed to you being on the couch?
6      A    I believe I told him I was in bed and she
7  got into bed and then I went to the couch.
8      Q    You never told -- in this first interview
9  with Sergeant Oliver you never told him that Erin had
10 started rubbing her feet with your feet?
11     A    No.
12     Q    You never told him that you had put your
13 left hand on her left hip?
14     A    Her left what?
15     Q    You put your left hand on her left hip and
16 she had moved closer to you?
17     A    No, I did not tell him that.
18     Q    You never told him that you claim that
19 Erin had started rubbing her buttocks in your groin
20 area?
21     A    No.
22     Q    You never told him that Erin had taken
23 your hand and placed it on her chest below her breast?
24     A    Nope.
25     Q    When she did that it's my understanding

Page 221

1  you're claiming that that's what she did?
2      A    That's what she did, yes.
3      Q    Did you feel any scars?
4      A    No.  I wasn't rubbing hard.  It was more
5  of a light rubbing.
6      Q    You never told the investigating officers
7  in that first interview that you had asked or told
8  Erin that you wanted to touch her breasts?
9      A    No.
10     Q    And did you in fact ask Erin if you could
11 touch her breast?
12     A    After things happened, yes.  After she
13 placed my hand below her chest, yes, I did say that.
14     Q    And that at some point in time you had
15 moved your hand up to the bottom of her breast when
16 she was laying on her side?
17     A    That's where she placed it in the first
18 place.  Below.  Is that what you just asked?
19     Q    Well, the narrative here says, Jason then
20 asked the victim if she was okay where his hand was
21 and that she nodded with her head that she was.  Jason
22 then asked or told her that he wanted to touch her
23 breast.  Do you recall doing that?
24     A    Yes.
25     Q    The victim then lifted her shirt up to the

Page 222

1  bottom of her breast not exposing her breast but
2  exposing her bare stomach.  Is that a true statement?
3      A    Yes.
4      Q    And that Jason then brought his hand up
5  and touched the bottom of her breast with his hand
6  while she was still lying on her side.  Do you recall
7  telling Sergeant Oliver in that fourth interview that
8  you had done that?
9      A    Yes.
10     Q    But again, in the first interview you had
11 not told him that?
12     A    Correct.
13     Q    You never told Sergeant Oliver that -- and
14 I'll read the words, the victim took his hand and
15 placed it on top of her vagina area but over her
16 clothing.  You never told Sergeant Oliver that in the
17 first interview, did you?
18     A    Nope.
19     Q    You never told him any of this information
20 about touching of Erin on her breasts or on her pants?
21     A    No.
22     Q    Why didn't you?
23     A    No excuse.
24     Q    Were you worried that you were going to
25 get in trouble with the police department?

Page 223

1      A    I was ashamed that I betrayed my
2  girlfriend.
3      Q    That was your main concern?
4      A    Yes.
5      Q    And your girlfriend had called you while
6  Erin was at your apartment; is that correct?
7      A    Correct.
8      Q    Did you tell her -- did you have a
9  conversation with her?
10     A    Yes, I did.
11     Q    Did you tell your girlfriend that Erin was
12 there?
13     A    No, I did not.
14     Q    Did the phone conversation happen before
15 or after the touching that occurred in your bed?
16     A    After.
17     Q    You didn't report to her that you had
18 touched -- there had been some sexual touching going
19 on with Erin?
20     A    No.  Not at that time.
21     Q    So that first interview happened on
22 July 2, 2005?
23     A    Sounds correct.
24     Q    And then if you turn to Exhibit 20 --
25     A    Could have been July 3rd.

Page 224

1    A    That night.  The night that I was put on
2  administrative leave I talked to her.
3    Q    What did you tell her?
4    A    I don't recall specifically what I told
5  her.  I told her I was put on administrative leave,
6  possible allegations of what was said from what I
7  could gather from the investigators.
8    Q    Did you tell her that any -- that there
9  had been any sexual touching between you and Erin?
10    A    I don't think I told her at that time, no.
11    Q    Did she ask you?
12    A    I don't recall if she asked me at that
13  time or not.
14    Q    How soon -- at some point in time did she
15  ask you if you had sexually touched Erin?
16    A    I don't recall if she asked me that
17  specific question, but I told her exactly what
18  happened.
19    Q    And when was that?  Was it before the
20  polygraph exam?
21    A    No.
22    Q    Was it after?
23    A    Yes.
24    Q    How far after?
25    A    When was the polygraph?  July 18.  Maybe a

Page 233

1  couple weeks after this.
2    Q    Where did you tell her?
3    A    In my car.
4    Q    Again, turn to Page 13.  There again
5  Sergeant Oliver asked you, so nothing happened, Jason?
6         And you answered, nothing happened.
7         He asked again, I mean anything at all?
8         And you said, nothing happened.
9         You were lying there, were you not?
10    A    Yes.
11    Q    At the end of your statement that you gave
12  on July 18 on Page 15 you asked Sergeant Oliver, can I
13  talk to you alone unrecorded?
14         And he answered, sure, sure, if that's
15  what you would like to do.
16         And then you say, okay.
17         Did you have a conversation with Sergeant
18  Oliver?
19    A    Yes.
20    Q    On the 18th?
21    A    I believe I did, yes.
22    Q    And was that unrecorded?
23    A    Yes.
24    Q    What did you -- what was your conversation
25  with him after the tape recorder was turned off?

Page 234

1    A    I don't even remember the conversation
2  that we had.
3    Q    But you had asked him to turn the tape
4  recorder off?
5    A    Yes.  I recall that.
6         MR. PLANT:  Isn't that what Exhibit 20 is?
7         MR. MORTENSEN:  I think that's a different
8  day.
9         MR. PLANT:  Just clarifying.
10    Q    (BY MR. MORTENSEN)  Would you turn to
11  Exhibit 21.
12         MR. PLANT:  Excuse me, I mean Exhibit 22.
13  Isn't that what Exhibit 22 is, the unrecorded
14  conversation with Oliver?
15         MR. MORTENSEN:  No, there was another
16  unrecorded conversation on the 20th.
17         MR. PLANT:  Okay.
18    Q    (BY MR. MORTENSEN)  Do you have
19  Exhibit 21 in front of you?
20    A    Yes.
21    Q    And you've had an opportunity to read
22  this?
23    A    Yes.
24    Q    And you understood that at least the
25  beginning portion of that interview was recorded?

Page 235

1    A    Yes.
2    Q    And Sergeant Oliver stated on Page 1,
3  okay, and the reason for that is you said you hadn't
4  been truthful in some other interviews that we had
5  conducted with you?
6         And you answered, yes.
7         That's correct?
8    A    Yes.
9    Q    So you told Sergeant Oliver on tape that
10  you had not been honest with him?
11    A    Correct.
12    Q    And then you made a -- your Miranda rights
13  were read to you?
14    A    I believe they were, yes.
15    Q    And the tape recorder was turned off and
16  then you had an interview with Sergeant Oliver off the
17  record or off the tape recorder?
18    A    Correct.
19    Q    And we've already gone through his
20  transcription or his report of what you told to him
21  during that interview?
22    A    Yes.
23    Q    And I take it from your testimony that you
24  believe any contact or sexual contact with Erin was
25  consensual?

Page 236

1    A    Yes.

2    Q    Are you aware of any statutes that pro --

3    strike that.  When you say that it was consensual what

4    makes you believe or what facts do you rely upon in

5    claiming that the sexual contact was consensual with

6    Erin?

7    A    She initiated the touching.  She grabbed

8    my hand and placed it places.  I asked her if it was

9    okay for my hand to be there, she said yes.  She was

10   interactive during the incident.

11   Q    Did you ever kiss her?

12   A    No.

13   Q    Did she ever -- were you aware if she ever

14   fell asleep before the touching happened?

15   A    No, she was not asleep before the touching

16   happened.

17   Q    It's my understanding if I read your

18   report right -- or read the report right and

19   understand your testimony here today that she was on

20   the computer and you got in the bed first?

21   A    Correct.

22   Q    And how were you dressed when you got in

23   the bed?

24   A    I don't recall what I was wearing.  From

25   the reports I was wearing cargo shorts and a shirt,

Page 237

1    T-shirt.

2    Q    And that would be -- would that be

3    consistent with something that you would wear to bed?

4    A    Not by myself.  With people there, yes.

5    Q    And so at that point in time when you got

6    into bed was it your intention to go to sleep?

7    A    I wanted to go to sleep, yes.

8    Q    And Erin was on the computer?

9    A    Correct.

10   Q    And so you had no intention at that point

11   in time of watching the DVD that you'd referenced?

12   A    I don't know what -- if my intentions to

13   watch that came later or at that time.  I don't know.

14   Q    Did you watch Runaway Jury that night?

15   A    I put it in and I watched maybe 20 minutes

16   of it until I could hear her snoring.

17   Q    And so you heard her snoring after the

18   sexual contact had happened?

19   A    Yes.

20   Q    And then once you heard her snoring you

21   fell asleep?

22   A    Yes.

23   Q    It doesn't sound like you got much sleep

24   that night?

25   A    That's correct.

Page 238

1    Q    And then you went back on shift?

2    A    Yes.

3    Q    And you said you woke up about 6:15 was

4    it?

5    A    Yes.

6    Q    And what time did you drop Erin off?

7    A    Maybe a quarter to seven, approximately

8    quarter to seven.

9    Q    What time did you wake her up?

10   A    Shortly before -- I woke up at -- between

11   6:15 and 6:30, enough time to shower, get dressed and

12   get out the door.

13   Q    And did you get showered and get dressed

14   before you woke Erin up?

15   A    Yes.

16   Q    So when you woke Erin up you were in your

17   uniform?

18   A    Yes, I was.

19   Q    And then you took her out to your police

20   car?

21   A    Yes.

22   Q    And you transported her to the Maverick?

23   A    Yes.

24   Q    And did you have her fill out any type of

25   ride along information or waiver?

Page 239

1    A    No.

2    Q    Did you call or radio in to dispatch or

3    let anyone know that you were transporting Erin?

4    A    No.

5    Q    Why not?

6    A    I was dropping her off on the way to work.

7    Q    Was -- do you view that to be a violation

8    of the ride along policy?

9    A    That wouldn't be considered a ride along.

10   Q    How about the transport policy?

11   A    As per policy, yes, but as stated before,

12   that was a common practice.

13   Q    So common practice was in violation of the

14   stated procedure?

15   A    From what other officers did if you went

16   word for word, yes.

17   Q    So it was your experience that other

18   officers would give people rides?

19   A    Drop their kids off on their way to work

20   in their patrol cars and pick them up on the way home,

21   yes.

22   Q    Would they give homeless people rides?

23   A    I don't know.

24   Q    Would they give people on a regular basis

25   that smelled like alcohol rides?

Page 240

GARY JASON BURNHAM                                                                                    April 23, 2007

1    Q    Did you ever receive any training with
2  regard to whether a person that's extremely
3  intoxicated can give consent to sexual touching?
4    A    Specific training, no.  In the academy I
5  believe that's just part of the statute when you go
6  over code.
7    Q    What's your understanding as to what the
8  statute says?
9    A    A person who's intoxicated can't give
10  consent.
11    Q    And you knew that -- you had that
12  understanding when you took Erin home?
13    A    That a person intoxicated couldn't give
14  consent?
15    Q    Correct.
16    A    Correct.
17    Q    You knew that, didn't you?
18    A    Yes, correct.
19    Q    You knew that a person who was intoxicated
20  couldn't give consent on July 2 of 2005?
21    A    I said yes, correct.
22    Q    Did you also have an understanding that a
23  person cannot give consent if they're being coerced
24  with -- via a threat of some harm if they don't submit
25  to sexual touching?

Page 245

1    A    Correct.
2    MR. PLANT:  Object to form of the
3  question.  Vague and ambiguous.  It does call for a
4  legal conclusion.
5    Q    (BY MR. MORTENSEN)  Did you have that
6  understanding?
7    A    That a person under duress of being
8  threatened with something can't give consent?
9    Q    Correct.
10    A    Yes.
11    Q    So you couldn't -- as a police officer you
12  couldn't go up to a suspect and say, I'm going to take
13  you to jail unless we have sexual touching or sexual
14  contact?
15    A    Correct.
16    Q    You couldn't hold that type of threat over
17  that person?
18    A    That's right.
19    Q    And if that happened that would not be
20  consensual touching?
21    A    Correct.
22    Q    In your conversations with Sergeant Oliver
23  did he ever ask you why you had lied to the District
24  Attorney's office in these three interviews?
25    A    I don't remember if he asked me why.

Page 246

1    Q    Did anyone in the investigation ask you
2  why?
3    A    When I went to talk to Sergeant Oliver I
4  think I laid everything out on the table beforehand.
5  I don't think he asked me, I think I just told him.
6    Q    You just told him why you had lied?
7    A    Yes.
8    Q    And what did you tell him?
9    A    I don't recall what I told him why I lied.
10    Q    At some point in time were you told that
11  there was an Internal Affairs investigation going on
12  from South Salt Lake Police Department?
13    A    Yes, the night that I was put on
14  administrative leave.  Well, I don't know if I'm
15  assuming that or if I officially got a letter, but one
16  would assume you get put on administrative leave
17  there's an Internal Affairs investigation going on.
18    Q    And your last interview with Sergeant
19  Oliver was on July 20 of 2005.  Did you have any
20  conversations with anyone from the District Attorney's
21  office after that interview?
22    A    I don't know if I did or not.
23    (Whereupon, Deposition Exhibit No. 25 was
24  marked for identification.)
25    Q    (BY MR. MORTENSEN)  Mr. Burnham, I've

Page 247

1  handed you what's been marked as Deposition
2  Exhibit 25.  Do you recognize that document?
3    A    Yes.
4    Q    And is that signed by you?
5    A    Yes.
6    Q    And was it typed by you?
7    A    Yes.
8    Q    Was it typed on your computer?
9    A    Yes.
10    Q    Do you know if there were any other drafts
11  to this letter?
12    A    Not that I'm aware of.  It's a pretty
13  short letter.
14    Q    You had resigned from the police
15  department?
16    A    Yes.
17    Q    Why did you resign?
18    A    States right in there why I resigned.
19    Q    Were there any other reasons?
20    A    Stress caused by investigations that I had
21  to go through all the time.  That was the reason.
22  Well, the reason's stated right here, yes.  Additional
23  to this, no.
24    Q    Had anyone told you that you were going to
25  be terminated from the South Salt Lake Police

Page 248

IN THE UNITED STATES DISTRICT COURT IN AND FOR

DISTRICT OF UTAH, CENTRAL DIVISION

ERIN V. NIELSON,                    :
            Plaintiff,              :
                                    :
            vs.                     :
                                    :  Case No. 2:06-CV-335
SOUTH SALT LAKE CITY and OFFICER    :  Judge Kimball
GARY JASON BURNHAM,                 :
                                    :
            Defendants.             :
                                    :
                                    :

---

DEPOSITION UPON ORAL EXAMINATION OF

GARY JASON BURNHAM

---

TAKEN AT:      36 South State Street
               Suite 2400
               Salt Lake City, Utah 84111

DATE:          September 10, 2007

REPORTED BY:   AMBER PARK, RPR, CSR



DEPOMAXMERIT
LITIGATION SERVICES

333 SOUTH RIO GRANDE                        TOLL FREE 800-337-6629
SALT LAKE CITY, UTAH 84101                  PHONE 801-328-1188
WWW.DEPOMAXMERIT.COM                        FAX 801-328-1189

• A TRADITION OF QUALITY •

GARY JASON BURNHAM                                                September 10, 2007

| | |
|---|---|
| 1    A    I believe we talked about it, yes. | 1    A    Immediately. |
| 2    Q    And did you mention that she worked at the | 2    Q    Did you ever see the baby? |
| 3  zoo? | 3    A    Yes. |
| 4    A    Yes. | 4    Q    Did you ever hold the baby? |
| 5    Q    And what's her name? | 5    A    Yes. |
| 6    A    I don't recall right now.  I might | 6    Q    How old were you when this happened? |
| 7  remember in a little while. | 7    A    16 or 17. |
| 8    Q    So you did have an affair with someone who | 8    Q    And were you in high school? |
| 9  worked at the zoo? | 9    A    Yes. |
| 10    A    I had a relationship with someone who | 10    Q    Were there other people that knew about -- |
| 11  worked at the zoo after my wife and I had split up. | 11  any friends of yours that knew about this baby? |
| 12    Q    And what time period was that | 12    A    Her parents and mine. |
| 13  relationship? | 13    Q    Any ecclesiastical leaders? |
| 14    A    Summertime of 2003, spring, summer. | 14    A    Yes. |
| 15    Q    And did that relationship include a sexual | 15    Q    Who? |
| 16  relationship? | 16    A    My Bishop. |
| 17    A    Yes. | 17    Q    And who was the name of your Bishop? |
| 18    Q    And then I'd also gone back and looked at | 18    A    I don't recall. |
| 19  your deposition and you were not specifically asked | 19    Q    Now it's my understanding that you served |
| 20  about a high school girlfriend placing a baby for | 20  an LDS mission? |
| 21  adoption.  And so I want to go back because Deann did | 21    A    Yes. |
| 22  testify that you had told her that -- as a matter of | 22    Q    And it's also my understanding that if you |
| 23  fact, she said that she had photographs of the | 23  have ever fathered a child -- and I believe this was |
| 24  girlfriend holding the baby and that she still has | 24  the case then also -- that you're disqualified from |
| 25  those photographs.  And so this is my one chance to | 25  serving an LDS mission? |
| Page 21 | Page 23 |

| | |
|---|---|
| 1  talk to you and I just want to know -- make sure the | 1    A    You're incorrect in your assumption. |
| 2  record's clear that you never -- is it your testimony | 2        MR. PLANT:  Objection.  Assumes facts not |
| 3  that you never impregnated a girl during high school? | 3  in evidence. |
| 4    A    I never said that.  We talked about her | 4    Q    (BY MR. MORTENSEN)  Tell me, did your |
| 5  getting pregnant at our last deposition.  We did not | 5  ecclesiastical leader who called you on a mission know |
| 6  talk about what the -- what happened with the baby. | 6  about this baby? |
| 7    Q    So you did get a girl pregnant in high | 7    A    I just testified -- |
| 8  school? | 8        MR. CONDER:  Same objection.  Just |
| 9    A    Yes. | 9  irrelevant.  I don't know where we're going with this. |
| 10    Q    And what happened with the baby? | 10  I don't know how it's relevant in any way. |
| 11    A    The baby was adopted. | 11        MR. MORTENSEN:  Do you want me to -- I can |
| 12    Q    When -- what's the name of the girl that | 12  lay a record on why it is relevant. |
| 13  you got pregnant? | 13        MR. CONDER:  Sure. |
| 14    A    Nicky Gibbs. | 14        MR. MORTENSEN:  Okay.  Your client has |
| 15    Q    And do you know where Nicky Gibbs lives? | 15  alleged that my client has lied about some things that |
| 16    A    No. | 16  happened, and so I think that your client is showing a |
| 17    Q    When's the last time you saw Nicky? | 17  propensity to be dishonest, especially when it |
| 18    A    15 years ago.  I don't think that's her | 18  involves sexual matters, where he may have got his |
| 19  last name anymore either. | 19  hand caught in the cooker jar. |
| 20    Q    But Nicky had a baby? | 20        MR. CONDER:  At age 16? |
| 21    A    Correct. | 21        MR. MORTENSEN:  Sure. |
| 22    Q    And were you the father? | 22        MR. CONDER:  At age 16? |
| 23    A    Yes. | 23        MR. MORTENSEN:  Sure.  And so I think I'm |
| 24    Q    And how soon after the baby was born was | 24  entitled to go into it. |
| 25  the baby placed for adoption? | 25        MR. CONDER:  You can head that direction |
| Page 22 | Page 24 |

GARY JASON BURNHAM                                                September 10, 2007

**Page 37**

1  again, Shannon testified to some -- to an event where
2  you had brought out in front of her a used tampon. Do
3  you recall any such event?
4      A    No.
5      Q    You don't -- let me read her answer just
6  so I can move past this and know what your position
7  would be on her testimony. She said there was a time
8  at the apartment that he had brought out used tampons
9  that were in one of his -- I don't know where he got
10  them from. They were in one of the bedrooms and so
11  that obviously came from somewhere, not mine. Do you
12  recall that event?
13     A    I have no clue what she's talking about.
14     Q    I believe she was asked if you had ever
15  had any kind of sexual relations with other women, and
16  in response to that she brought this event up. So I
17  just -- if asked at trial you wouldn't have any
18  information or have any memory about any such event?
19     A    Correct.
20     Q    And if asked at trial your answer would be
21  that that testimony is false by Shannon?
22     A    Correct.
23     Q    Did -- I believe from your earlier
24  testimony you testified that you were friends with
25  Scott Daniels?

**Page 38**

1      A    Yes.
2      Q    Did Officer Daniels ever tell you about
3  any Internal Affairs investigations that were done on
4  him?
5      A    We talked when he was on administrative
6  leave. I called him to see how he was doing.
7  Everybody knew there was an Internal Affairs
8  investigation going on. I don't recall anything
9  specific being said. I believe I just asked him how
10  he was doing and made sure he was doing all right.
11  Asked him if he needed anything.
12     Q    Do you know the woman that made the
13  allegation against him?
14     A.   No.
15     Q    Did he ever mention to you, Scott Daniels
16  ever mention to you an Internal Affairs investigation
17  that was done about ten years earlier on him?
18     A    Not that I recall.
19          MR. MORTENSEN:  I believe that's all the
20  questions I have.  Thank you.
21
22              EXAMINATION
23
24  BY MR. PLANT:
25     Q    Officer Burnham, my name's Terry Plant, I

**Page 39**

1  represent the City of South Salt Lake. I just have a
2  few questions. I'd like to take you back to the night
3  of this event, which I believe was July 2, 2005. If I
4  heard you right, Mr. Burnham, you indicated that on
5  that night you didn't call in where you were going
6  because you knew if the people at the City or the
7  police department knew what you were doing they
8  wouldn't approve. Is that fair?
9      A    I don't know what you're referring --
10     Q    Let me go back, I'm trying to short
11  circuit. When you decided to put this young lady,
12  Erin Nielson, in your car and go back to your
13  apartment, you didn't notify anybody at the City about
14  that fact, did you?
15     A    Correct.
16     Q    And the reason you didn't is because you
17  knew if they did they would not approve of that act;
18  is that fair?
19     A    It was approximately two blocks and I was
20  going off duty right at that time.
21     Q    But regardless, you knew if you had
22  notified someone at the City that you were going to do
23  that they would not have approved of your action?
24     A    Most likely, correct.
25     Q    And the reason you knew that is because

**Page 40**

1  taking a young lady back to your home, whether it was
2  written or not, would not be approved by the City and
3  by the police department and the regulations with
4  which you were obligated to comply?
5      A    Most likely, correct.
6      Q    Can you think of any reason, Mr. Burnham,
7  or any fact that you can point me to that would have
8  notified the City or the police department that you
9  were in fact going to take Erin Nielson back to your
10  apartment that evening?
11     A    I don't know of any.
12     Q    Do you know of anyone for the City or for
13  the police department who had an awareness of your
14  actions that night?
15     A    No.
16     Q    Did you notify anyone -- and I'm using
17  broad terms on purpose -- that in fact you intended to
18  take her back to your apartment with you that evening?
19     A    No.
20     Q    Again, do you know of anyone that knew or
21  might have known that you were going to do -- commit
22  these actions that night?
23     A    No.
24     Q    Looking back over your career with the
25  City, with the South Salt Lake Police Department, can

| | |
|---|---|
| 1   Outside of that that is true. I think that's what you | 1    A   Yes. |
| 2   were asking. | 2    Q   And then there was another one based upon |
| 3    Q   Well, was there any sexual impropriety | 3   the allegations that Shannon made? |
| 4   committed by you other than perhaps having these women | 4    A   Yes. |
| 5   flash you? | 5    Q   And was there one based upon an excessive |
| 6    A   No. | 6   force claim that was brought against and you another |
| 7    Q   To your knowledge did any supervisor or | 7   officer? |
| 8   other officer other than as set forth in Exhibit 52 | 8    A   Oh, yes. |
| 9   ever become aware of these breast flashing incidents? | 9    Q   And was there one where -- I believe it |
| 10    A   There may have been a few. I couldn't say | 10   was -- maybe there had been an allegation of a piece |
| 11   one way or the other. | 11   of evidence being stolen or a knife being stolen or |
| 12    Q   Okay. Did you ever tell anyone of any -- | 12   something along those lines? |
| 13   whether you were involved with sexual incidents with | 13      MR. PLANT: Object to that one. I think |
| 14   Shannon or others in your police car -- would there | 14   that misstates the evidence. I don't think that's |
| 15   have been any way that to your knowledge that any | 15   true. |
| 16   members of the police force, be it other officers or | 16    Q   (BY MR. MORTENSEN) And it may. I'm just |
| 17   supervisors, could have or were aware of such actions? | 17   asking -- I have a recollection of an allegation being |
| 18    A   No. | 18   made against you that a knife or some piece of -- a |
| 19    Q   Again, I asked this question, I'll ask it | 19   weapon had come up missing. |
| 20   again now that we've reviewed some of these facts. | 20      MR. PLANT: Same objection. I think that |
| 21   Was there any way that you're aware of that the South | 21   misstates the evidence. |
| 22   Salt Lake City Police Department could have been aware | 22      MR. MORTENSEN: Let me take a two-minute |
| 23   prior to the incidents involving Erin Nielson that | 23   break. Let me go get the file. I should have brought |
| 24   that was going to occur? | 24   it in. I apologize. |
| 25    A   No. | 25      (Whereupon, a recess was taken.) |
|                   Page 49 |                   Page 51 |
| 1      MR. PLANT: That's all I have. | 1    Q   (BY MR. MORTENSEN) I think counsel for |
| 2      MR. CONDER: No questions. | 2   South Salt Lake was right and that the fourth IA file |
| 3 | 3   was based on the allegations of this case. Let me ask |
| 4          **FURTHER EXAMINATION** | 4   you, did you resign from the police department because |
| 5 | 5   you had not been honest with the District Attorney's |
| 6   BY MR. MORTENSEN: | 6   office or was it because of the sexual conduct that |
| 7    Q   Do you know -- no one from South Salt Lake | 7   you engaged in or was it both? |
| 8   ever called the victim's advocate -- | 8    A   It wasn't because of the sexual conduct. |
| 9      MR. PLANT: Tessa Inskeep. | 9   There was a lot more that went into it than just that. |
| 10    Q   (BY MR. MORTENSEN) -- Tessa, to determine | 10    Q   Well, let me ask you this, if a -- if it |
| 11   whether or not you had had any type of affair with | 11   was your understanding that a police officer had a |
| 12   her? | 12   right to do whatever he wanted to do while off duty |
| 13      THE WITNESS: I do not know one way or the | 13   within the confines of the law why did you lie about |
| 14   other. | 14   it? Why did you lie about what happened with Erin |
| 15    Q   (BY MR. MORTENSEN) And it's my | 15   Nielson to the District Attorney's office three times? |
| 16   understanding that you had had four Internal Affairs | 16      MR. PLANT: Objection. Misstates the |
| 17   investigations done on you while at South Salt Lake; | 17   evidence. |
| 18   is that correct? | 18      THE WITNESS: I believe I already answered |
| 19    A   I don't know. After a while they open up | 19   that question in the last deposition. |
| 20   an Internal Affairs investigation for really minor | 20    Q   (BY MR. MORTENSEN) Why did you lie? |
| 21   things and they could have opened them and closed them | 21      MR. PLANT: Same objection. |
| 22   and not even given a second thought to me. If you | 22      THE WITNESS: I was embarrassed. |
| 23   name what they are I can tell you yes or no. | 23   Allegations were made of things I didn't do and I was |
| 24    Q   Well, there was one based upon the | 24   denying everything as a whole to get out of the |
| 25   allegations that Deann made? | 25   situation. I can't tell you 100 percent why I wasn't |
|                   Page 50 |                   Page 52 |