IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ERIN V. NIELSON,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF SOUTH SALT LAKE and OFFICER GARY JASON BURNHAM,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:06-CV-335 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Plaintiff Erin V. Nielson ("Nielson") alleges that Defendant Gary Jason Burnham ("Burnham") sexually assaulted her on or about July 2, 2005.  At the time, Burnham was a police officer at the South Salt Lake police department.  Nielson further alleges that Defendant The City of South Salt Lake ("South Salt Lake") knew that Burnham had a negative pattern of conduct towards women and it failed to instruct, supervise, control and/or discipline Burnham for such conduct.  In addition, Nielson asserts claims for negligence and for violations of the Utah Constitution.  South Salt Lake has moved for summary judgment on the basis of qualified immunity.  Because the court concludes a reasonable jury may find that South Salt Lake acted with deliberate indifference, the court denies South Salt Lake's summary judgment motion on Nielson's § 1983 action.  It grants summary judgment of Nielson's state constitutional law claims, because § 1983 provides an adequate remedy at law, and on Nielson's negligence claim.

## FACTUAL BACKGROUND

Burnham was a police officer with South Salt Lake from August 1999 until August 2005. It is undisputed that South Salt Lake performed a proper screening before it hired Burnham. It is also undisputed that Burnham lied during the screening process about his prior sexual activity. He reported that he had had no sexual relations before his marriage at age 25, when in fact he became sexually active in his teens and fathered a child at age 16.[1] While with the department Burnham received a number of commendations. He also had six complaints filed against him that resulted in four Internal Affairs investigations ("I.A. investigation") between 2002 and 2005.[2] In comparison, "[t]he majority of [South Salt Lake's] officers never see an Internal Affairs investigation."[3] Nielson contends that three of the complaints put South Salt Lake on notice that Burnham posed a danger.

**PRIOR INCIDENTS**

    **A.**     **Complaint by Deann Burnham**

        1.     <u>The Allegations</u>

In December 2002, Deann Burnham ("Deann") filed a complaint with Salt Lake Police Department Internal Affairs and other departments and agencies against Burnham. Deann was Burnham's wife. She asserted that Burnham had engaged in several incidents of sexual misconduct, including inappropriate touching of women he encountered while on duty and having an affair with a woman he took on a ride-along. Deann also reported that Burnham raped her and molested their

---

    [1] Deposition of Gary Burnham, Vol. 1, 63:19–67:8; Vol. 2, 22:7–23 (Docket No. 38, Ex. 2) (hereinafter "Burnham Depo.").

    [2] Deposition of Chris Snyder, 9:16–25 (Docket No. 45, Ex. E) (hereinafter "Snyder Depo.").

    [3] <u>Id.</u> at 10:10–17.

daughter.

Specifically with regard to women Burnham encountered while on duty, Deann reported that in the summer of 2001, Burnham went to a woman's house a few times in response to calls.[4] They shared personal information with each other, she exposed her breasts to him, "and he said 'whoa.'"[5] On another occasion, he saw the same woman while out on patrol, and she purportedly exposed her breasts to him again while they were in a dark parking lot.[6] In turn, he allegedly showed her his penis and watched her masturbate, but declined to have her touch his penis or have oral sex with her.[7] Burnham also purportedly engaged in similar activities with another woman while he was on duty, except the second woman did not masturbate.[8] The incident occurred at the woman's house, and he also had been to her house a few times on calls prior to the incident.[9] The first woman purportedly was thirty-three and the other thirty-eight.[10]

Deann further reported an incident with a third woman during 2002. Over a period of a few months, Burnham was on duty at a bar, keeping the peace during closing.[11] While there, he met a

---

[4] Statement of Deann Burnham, 1 (Docket No. 45, Ex. A) (hereinafter "Deann Statement").

[5] Id.

[6] Id.

[7] Id.

[8] Id.

[9] Deann Statement, 2 (Docket No. 45, Ex. A)

[10] Id.

[11] Id.

woman who gave him her telephone number.  On about November 17, 2002, Burnham gave the woman a ride home in his police vehicle.  Burnham purportedly penetrated her vagina with his finger during the drive, and she touched his penis, but Burnham declined oral sex.[12]  Deann reported that the woman lived in West Valley, had three children and was twenty-four years old.  Deann also reported that Burnham took a woman on a ride-a-long with whom he was having an affair, and that Burnham had said no one suspected the situation "because they were often assigned ride-alongs."[13]

In addition, Deann alleged that Burnham sexually abused their three-year-old daughter by touching her "private parts."[14]  She then warned the investigators that her husband has a "great ability to deceive" and that a careful investigation was needed.[15]  Finally, in a Petition for Protective Order, Deann alleged that Burnham "forced himself upon me in an attempt to get sex (numerous times) - my bedroom, kitchen.  He did suceed [sic] once.  (I consider this rape.)"[16]  She further said that "He is a predator on the loose."[17]  As a result of these allegations, Burnham was placed on administrative leave.

2.      The Internal Affairs Investigation

Internal Affairs obtained the Clinton police and investigative file on the child abuse

---

[12]  Id.

[13]  Id.

[14]  Id.

[15]  Id.

[16]  Verified Petition for Protective Order, ¶ 5 (Docket No. 45, Ex. B).

[17]  Id.

allegation.[18]  During the Clinton investigation, Burnham's daughter said "her father touched her bum, and when pointing to a body parts inventory, [she] pointed to her vaginal area and stated that it was her bum."[19]  She also added in fantasy to some of her disclosures, however, throughout her interview.[20]  The Deputy Davis County Attorney declined to prosecute.  Under the Reasons for Declination, he stated:  "Due to insufficient evidence, this case cannot be successfully prosecuted.  The three-year-old child is not able to give sufficient information to sustain a trial-worthy case.  Her disclosure gives no specificity as to the nature or context of any alleged touching or apology."[21]

Besides obtaining and reviewing this information, Internal Affairs also interviewed Burnham.[22]  Burnham denied the allegations of sexual abuse.[23]  He also denied that he forced his wife to have sex with him.[24]  He admitted to viewing pornography and being "involved with girls."[25]  He also admitted that "[p]eople have shown me their breasts."[26]  He explained the location of one

---

[18]  The alleged sexual assault occurred in Clinton, Utah where the family was living at the time.

[19]  Letter to Commissioner Dillon, 2nd District Court, at SSL 0753 (Dec. 27, 2002) (Docket No. 45, Ex. DD).

[20]  See Interview with Daughter of Burnham, at SSL 0819–30 (Docket No. 45, Ex. DD).

[21]  Declined Prosecution Statement, at SSL 0858 (Jan. 29, 2003) (Docket No. 45, Ex. DD).

[22]  See Transcript of Internal Affairs Interview with Burnham (Docket No. 45, Ex. D) (hereinafter "First I.A. Transcript").

[23]  Id. at 3.

[24]  Id. at 18.

[25]  Id. at 5.

[26]  Id. at 10.

of the homes where an incident occurred while he was on duty, but said he told the woman "to knock it off" when she exposed her breasts.[27]  He denied meeting her again later in a parking lot.[28]

Burnham further admitted that he did give a woman a ride home from a bar in his police vehicle, but he stated he got clearance to do so from Sergeant Jack Carruth.[29]  He denied having any sexual conduct with her.[30]  He also denied having any sexual conversation with her.[31]  During Burnham's deposition in this case, however, Burnham admitted that the woman offered him oral sex.[32]

When questioned about having an affair during the Internal Affairs investigation, the investigator asked Burnham specifically what his relationship was with a particular Victim's Advocate because of reports he had received *from another* besides Deann.[33]  Burnham said they were just friends and had never had a sexual relationship.[34]  During his deposition in this case, however, he admitted that he did have an affair with the woman.[35]

---

[27]  Id. at 10.

[28]  Id. at 11.

[29]  Id. at 15.

[30]  Id. at 16.

[31]  Id.

[32]  Burnham Depo., 107:4–7; 108:20–24 (Docket No. 45, Ex. J).

[33]  First I.A. Transcript, 20–21; 22:23–25 (Docket No. 45, Ex. D).

[34]  Id. at 21.

[35]  Burnham Depo., 109:5–111:3 (Docket No. 45, Ex. J).

The investigator did not question the woman who exposed her breasts to Burnham about the incident.  The investigator also did not question the woman from the bar about her encounter with Burnham,[36] even though if a police officer does have sexual contact with a female passenger, such contact is grounds for termination.[37]  Nor did he check with Sergeant Carruth whether Burnham actually had cleared the ride-along with him,[38] despite the fact that any such request "would be very unusual."[39]  When the investigator was asked during deposition why he had not followed up on this information, he stated "It just had no bearing on what we were looking at on the case."[40]  Indeed, when Burnham was notified that South Salt Lake was commencing an internal investigation against him, the notice only referred to the allegations of domestic violence and sexual abuse of a child.[41] No reference to Burnham's sexual activities with women while on duty was included within the notice.[42]

Accordingly, there also is no indication that the investigator checked with dispatch about the transport of the woman to West Valley, even though an officer is required to call into dispatch his

---

[36]   Deposition of Steve Daniels, 26:19–23 (Docket No. 45, Ex. I) (hereinafter "Daniels Depo.").

[37]   Deposition of Joe Bennett, 16:5–13 (Docket No. 45, Ex. H) (hereinafter "Bennett Depo.").

[38]   Daniels Depo., 25:6–8 (Docket No. 45, Ex. I).

[39]   *See* Deposition of Sergeant Carruth, 27:1–6 (Docket No. 45, Ex. K) (testifying that it would be "very unusual" for an officer to ask to transport a woman home late at night by herself).

[40]   Daniels Depo., 25:6–12 (Docket No. 45, Ex. I).

[41]   Profession Standards Unit Notice of Internal Investigation (Dec. 23, 2002) (Docket No. 38, Ex. 16).

[42]   Id.

beginning and ending mileage when transporting a female passenger.[43]  Nor did the investigator ask

the Victim's Advocate about her relationship with Burnham to verify Burnham's veracity, even

though South Salt Lake can discipline an officer for lying during an investigation,[44] and Peace

Officer Standards and Training ("POST") "routinely and uniformly suspended a peace officer's

certification for two years as a penalty for lying in the course of an investigation."[45]

     The investigator did attempt to interview Deann Burnham, but she declined to be

interviewed.[46]  Thus, the investigator accepted Burnham's statements as true and stated on his final

report that he could neither "prove nor disprove the allegations made in the complaint."[47]  Burnham

returned to duty about the middle of January 2003.[48]

### B.     Complaint About Use of Excessive Force.

     During an arrest for interfering with an officer the following month, a woman claimed that

Burnham used excessive force against her and took twenty dollars out of her purse when he looked

through it to get her identification.   Other officers were involved at the scene.   South Salt Lake

---

[43]  Bennett Depo., 15:12–16:4 (Docket No. 45, Ex. H) (testifying about the policies and procedures when transporting a female passenger).

[44]  Daniels Depo., 19:17–22 (Docket No. 45, Ex. I).

[45]  Report of Kenneth R. Wallentine, 24 (Docket No. 38, Ex. 5).

[46]  The reason Deann declined to be interviewed in unclear.  Deann asserted during a deposition in this case that she did not meet with Internal Affairs because she had no confidence in them and she was afraid.  Deposition of Deann Burnham, 8:1–18 (Docket No. 45, Ex. C).  She told the investigator, however, that she was declining the interview based on the advise of her attorney. Transcript of Telephone Message, at SSL 0831 (Docket No. 45, Ex. DD).

[47]  Internal Affairs Unit, Final Case Disposition, 2 (Docket No. 38, Ex. 20).

[48]  *See* Supervisor's Activity Report, document 4 (Jan. 20, 2003) (Docket No. 38, Ex. 12).

conducted an Internal Affairs investigation , and interviewed some of the other officers at the scene. They corroborated Burnham's statements about the woman resisting arrest and the need for force. The department concluded the level of force was appropriate.  When Burnham was asked about the missing money, he denied taking it.  The I.A. investigator concluded there was no evidence to support that Burnham took the money, and he closed his investigation.

### C.        Complaint by Shannon Burnham

Shannon Burnham ("Shannon") was Burnham's second wife.  Burnham met her for the first time at a convenience store in June 2003.[49]  Other officers were present when they met, and they purportedly told Shannon that Burnham would allow her to ride along in his police car.[50]  Burnham did allow her to go on a ride-along with him, but never had her complete a waiver form in accordance with formal policy.[51]  Shannon continued to ride-along approximately every night for the next two weeks.[52]  During the rides, they saw other officers,[53] but questions exist regarding whether they saw her.  Eventually, the two started to engage in sexual relations while she traveled with him in his police car, and she moved in with him.[54]  While on duty, Burnham would stop at their

---

[49]  Deposition of Shannon Burnham, 7:6–13 (Docket No. 45, Ex. P) (hereinafter "Shannon Depo.").

[50]  Id. at 8:22–9:2.

[51]  Id. at 9:3–5; 9:22–10:2.

[52]  Id. at 19:13–16.

[53]  Id. at 17:9–18:5.

[54]  Id. at 20:14–23:6; 23:16–17.

apartment and have sexual relations with her before their marriage.[55]

On December 24, 2003, Shannon's sister reported that Burnham had physically abused Shannon by pushing her to the ground and attempting to kick her.[56]  When the Murray City Police responded to the call, Shannon was intoxicated, crying, and initially uncooperative.[57]  She said she did not want to get her husband in trouble, and that he did not deserve to be in trouble.[58]  As the police continued to talk with her, however, Shannon reported that she had been in a fight with Burnham and that he had pushed her to the ground.[59]  She also said that he kicked at her and had raped her previously.[60]  In between making these statements, however, she continued to assert that nothing happened and that her husband did not need another investigation.[61]  She further blamed herself for Burnham getting angry with her.[62]

Police photographs showed scratches on Shannon's face, bruising on her shoulder, and the

---

[55]  Id. at 23:7–17.

[56]  Official Statement of Becky Coulter, at SSL 0673 (Docket No. 45, Ex. GG); see also Murray City Police, Detail Incident Report, at SSL 0665 (Docket No. 45, Ex. GG) (hereinafter "Detail Incident Report").

[57]  Detail Incident Report, at SSL 0664 (Docket No. 45, Ex. GG).

[58]  Id.

[59]  Id.

[60]  Id.

[61]  Id.

[62]  Id. at SSL 666.

Murray Police reported she had a sore spot on her chest.[63]  Shannon told the Murray Police that the abuse was an ongoing problem, but that she actually had scratched her own face during the fight when she pulled back from Burnham holding her wrists.[64]  Shannon's sister and a friend provided similar statements that Burnham abused Shannon, and that they had gone to Shannon's residence to retrieve personal belongings because she was scared.[65]  They also were intoxicated, however, at the time of making the statements.

Because the reported abuse took place outside of the Murray city boundaries, the Murray Police called in the Salt Lake County Sheriff's Office ("Sheriff's Office").  The officer from the Sheriff's Office reported that Shannon said over and over again that Burnham did not need an I.A. investigation.[66]  On January 2, 2004, Shannon went to the Sheriff's Office and completed a written statement.  In that statement, Shannon alleged again that Burnham pushed her to the ground and attempted to kick her.[67]  She further stated the abuse was ongoing and that "several times . . . [Burnham] forced himself on top of me for sex.  I have told him NO many times but that never made

---

[63]  Id. at SSL 664; see also Photographs, at SSL 0640–47 (Docket No. 45, Ex. GG).

[64]  Detail Incident Report, at SSL 0664, SSL 0666 (Docket No. 45, Ex. GG); Salt Lake County Sheriff's Report, at SSL 0680 (Docket No. 45, Ex. GG) (hereinafter "Sheriff's Report").

[65]  Detail Incident Report, at SSL 0673–76 (Docket No. 45, Ex. GG).

[66]  Sheriff's Report, at SSL 0679 (Docket No. 45, Ex. GG).

[67]  Witness Statement, 1 (Jan. 2, 2004) (Docket No. 45,  Ex. N); Sheriff's Report, at SSL 0680 (Docket No. 45, Ex. GG).

him stop."[68] An interview also was completed, which was both audio and video-taped.[69] On January 5, 2004, Burnham went to the Sheriff's Office and was interviewed.[70] He admitted arguing with his wife, and that he had "tapped the center of her chest."[71] He denied pushing her or raping her.[72] His interview also was recorded, and the reports were faxed to South Salt Lake.[73]

The Sheriff's Office then charged Burnham with Unlawful Detention and Disorderly Conduct.[74] Burnham eventually did a plea in abeyance for domestic violence and disorderly conduct.[75] He was ordered to attend sixteen weeks of domestic violence counseling courses.[76] Upon successful completion, the court said it would dismiss and close the case.[77]

POST has a policy, however, to suspend a peace officer's certification if an officer has pled guilty or entered a plea in abeyance for domestic violence.[78] Due to this issue, Burnham withdrew

---

[68] Witness Statement, at 2 (Docket No. 45, Ex. N).

[69] Sheriff's Report, at SSL 0680 (Docket No. 45, Ex. GG).

[70] Id.

[71] Witness Statement, at SSL 0684 (Docket No. 45, Ex. GG).

[72] See Sheriff's Report, at SSL 0680–81 (Docket No. 45, Ex. GG).

[73] Id. at SSL 0670, 0681.

[74] Domestic Violence Information (Docket No. 45, Ex. R).

[75] Judgment and Sentence, at SSL 0704 (Docket No. 45, Ex. GG).

[76] Id.

[77] Id.

[78] See E-mail from Chris Snyder to Theresa Garner, at SSL 0633 (Docket No. 45, Ex. GG).

his plea,[79] but nevertheless completed the counseling courses.[80]   POST later issued a Letter of Caution to him that stated his behavior "was inexcusable for a peace officer."[81]   The letter served "as official notice that any future violations of a similar nature will result in the suspension or revocation of your peace officer certification."[82]

On April 9, 2004, South Salt Lake initiated its own investigation of the incident.[83]   During that I.A. investigation, Burnham again denied ever assaulting Shannon, and said that he had only grabbed Shannon to stop her from hitting or otherwise injuring herself.[84]   He explained that the only reason he contemplated a plea bargain was so he could return to duty quicker, and not because he was guilty of anything.[85]   Shannon did not respond to the I.A. investigator's request for an interview, and the investigator stated there were no other "independent witnesses."[86]   The investigator concluded there was insufficient evidence to substantiate Shannon's claims because she was intoxicated when she made her report, had vacillated between saying nothing had happened and that

---

[79]   See Order Granting Stipulated Motion to Vacate Conviction, Withdraw Plea and Dismiss with Prejudice (Docket No. 38, Ex. 26).

[80]   Certificate of Completion (Docket No. 38, Ex. 27).

[81]   Letter from POST to Burnham (Jan. 25, 2005) (Docket No. 38, Ex. 28).  The letter was issued on January 25, 2005, approximately five months before the incident with Nielson.

[82]   Id.

[83]   Administrative Investigation, at SSL 0702 (Docket No. 45, Ex. GG).

[84]   Internal Affairs Unit, Final Case Disposition, 4 (Docket No. 38, Ex. 25).

[85]   Id. at 5.

[86]   Id.

Burnham had abused her, and had refused to cooperate in the I.A. investigation.[87]  South Salt Lake therefore closed its investigation because it found no "potential policy violations."[88]

Nevertheless, when Theresa Garner, the Chief of Police for South Salt Lake, learned about Shannon's report, she personally believed that a pattern of behavior was forming.[89]  Because none of the I.A. investigations had concluded that Burnham acted improperly, however, she did nothing to increase supervision over Burnham.[90]  Nor did she talk with him or counsel him in any way regarding the incidents and the standards he needed to maintain as a police officer.[91]

**INCIDENT WITH NIELSON**

In the early morning hours of July 2, 2005, Nielson left a party where she had been drinking. A friend Sean Hadley ("Hadley") offered to walk her home because he did not want her walking alone at that hour of the morning.  The two stopped at Granite High School to sit on the steps and drink more beer.  Burnham arrived at the school in his police vehicle and approached Nielson and Hadley.  Burnham had both of them take a Breathalyzer test, and issued citations to them for under-

---

[87] Id.

[88] Id. at 6.

[89] Deposition of Theresa Garner, 46:10–13; 47:19–48:5 (Docket No. 45, Ex. U) (hereinafter "Garner Depo.").

[90] See id. at 45:13–17 (stating she had no recollection of increasing supervision over Burnham); see also Snyder Depo., 12:4–8 (Docket No. 45, Ex. E) (testifying that while he was Captain of the patrol division they did not watch Burnham more closely as a result of the I.A. investigations).

[91] Garner Depo., 42:18–20 (Docket No. 45, Ex. U).

age drinking.[92]  Two other officers also arrived during the course of the stop.[93]

After Burnham issued Hadley's citation, he told Hadley to leave.[94]  Hadley alleges he asked if he could stay, but Burnham told him he had to leave.[95]  Burnham then issued Nielson's citation and told her she could leave.[96]  She left on foot and the officers left in their vehicles.[97]  A few minutes later, Burnham pulled up to her in his police vehicle and offered her a ride home.[98]  Instead of taking her home, Burnham took her to his apartment.[99]  At about the time they arrived at his apartment, Burnham contacted the shift sergeant and checked off-duty.[100]

Nielson alleges that Burnham sexually assaulted her while she was at his apartment by touching her breasts and penetrating her vagina with his finger.[101]  At approximately 6:45 a.m.,

---

[92]  Uniform Citation or Information and Notice to Appear (Docket No. 45, Ex. W).

[93]  Salt Lake County District Attorney Criminal Investigations Unit Report, at SSL 0324 (Docket No. 45, Ex. V) (hereinafter ("D.A. Report").

[94]  Id.

[95]  Id. at SSL 0327.

[96]  Id. at SSL 0324.

[97]  Id.

[98]  Id.

[99]  Id.

[100]  Transcript of First Burnham Interview by District Attorney's Office, 4 (Docket No. 38, Ex. 40); D.A. Report, at SSL 0326 (Docket No. 45, Ex. V) (hereinafter "D.A. Interview").

[101]  D.A. Report, at SSL 0325 (Docket No. 45, Ex. V); Salt Lake Police Department Report, 7 (Docket No. 38, Ex. 37) (hereinafter "SLC Report").

Burnham then drove Nielson to a Maverick gas station to drop her off.[102]  The sexual assault was

reported at 4:37 p.m., and Nielson went to a hospital and received a sexual assault examination at

approximately 5:45 p.m. that evening.[103]

Burnham was placed on administrative leave that same day pending an investigation.  The

Salt Lake County District Attorney Criminal Investigations Unit interviewed Burnham.  He denied

that he had any sexual contact with Nielson.[104]  A few day later Burnham failed a polygraph test,[105]

and was re-interviewed on July 18, 2005.  Burnham again denied any sexual contact.[106]  On July 20,

2005, Burnham contacted the District Attorney's office and revised his earlier statement.  He

admitted having sexual contact with Nielson, but claimed it was consensual.[107]  Burnham resigned

---

[102]  D.A. Report, at SSL 0326 (Docket No. 45, Ex. V).

[103]  Sexual Assault Examination (Docket No. 38, Ex. 36).  The exam showed that Nielson had tenderness and a lesion in the vaginal area.  Id. at 5.  Nielson claims Burnham was on top of her when she awoke, and that after she pushed his hand away from her vaginal area, she either passed out or fell asleep again.  SLC Report, 7 (Docket No. 38, Ex. 37).  Because Nielson's polygraph test was inconclusive and she lacked specific information about the actual assault, the District Attorney's office concluded there was insufficient information to take the case to trial.  See Letter from Theresa Garner to Erin Nielson (Aug. 31, 2005) (Docket No. 38, Ex. 45).

[104]  See D.A. Interview, 13, 20 (Docket No. 38, Ex. 40).

[105]  A score of +6 indicates a person is being truthful.  Polygraph Report, at SSL 0340 (Docket No. 45, Ex. V).  A score between -5 and +5 is inconclusive.  Id.  A score below -5 indicates a person is being deceitful.  Id.  Burnham's score was a -12.  Id.  Nielson also took a polygraph test.  Her score was a +3.  Polygraph Report, at SSL 0335 (Docket No. 45, Ex. V).

[106]  See Transcript of Second Burnham Interview by District Attorney's Office (Docket No. 38, Ex. 42).

[107]  See Transcript of Third Burnham Interview by District Attorney's Office (Docket No. 38, Ex. 40); D.A. Report, at 0329–31 (Docket No. 45, Ex. V).

on August 26, 2005.[108]  On August 31, 2005, Internal Affairs again concluded there was insufficient evidence to prove that Burnham sexually assaulted Nielson.[109]  Internal Affairs did conclude, however, that Burnham violated South Salt Lake's ride-along policy, had lied to investigators, had failed to operate his dashboard camera during the initial stop, and had abused his authority and tools provided to him.[110]

<u>**ANALYSIS**</u>

## I.    STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is appropriate if the moving party demonstrates that 'there is no genuine issue as to any material fact' and that it is 'entitled to judgment as a matter of law.'"[111]  The court views the evidence in the light most favorable to the non-moving party, "and all justifiable inferences are to be drawn in the [nonmovant's] favor."[112]  Summary judgment must be entered "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[113]

---

[108]  Resignation Letter (Docket No. 38, Ex. 44).

[109]  Internal Affairs Unit, Final Case Disposition, at 1 (Docket No. 38, Ex. 35).

[110]  <u>Id.</u> at 2.

[111]  <u>United States ex rel. Burlbaw v. Orenduff</u>, 548 F.3d 931, 944 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).

[112]  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citation omitted).

[113]  <u>Orenduff</u>, 548 F.3d at 944 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

## II.   MUNICIPALITY LIABILITY - § 1983

### A.   *Brown* Standard

In 1997, the United States Supreme Court issued a landmark case regarding municipality liability.  The Court stated that "Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the "moving force" behind the plaintiff's deprivation of federal rights."[114]  Consequently, a municipality cannot be liable "solely because it employs a tortfeasor."[115]  Nor can it be liable for "simple or even heightened negligence."[116]  Rather, a plaintiff must show that a municipality acted with "deliberate indifference" to "known or obvious consequences."[117]  This "is a stringent standard of fault."[118]  Thus, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[119]

To ensure this standard is met, the Supreme Court has required the plaintiff "to identify a municipal 'policy' or  'custom' that caused the plaintiff's injury."[120]  A policy may result from the

---

[114]  Bd. of the County Comm's of Bryan County v. Brown, 520 U.S. 397, 400 (1997) (emphasis in original) (citation omitted).

[115]  Id. at 403.

[116]  Id. at 407.

[117]  Id. (citation omitted).

[118]  Id. at 410.

[119]  Id. at 404.

[120]  Id. at 403 (citations omitted).

decisions of "officials whose acts may fairly be said to be those of the municipality."[121]  Even if a policy has not been formally approved, if a "practice is so widespread as to have the force of law" it can constitute a custom of the municipality.[122]  Through these measures, the Supreme Court has distinguished "between conduct that may be attributed to the municipality, and conduct of the municipality that manifests culpability and causality."[123]

### B.    Application of *Brown*

To establish whether a municipality is liable, plaintiff must prove (1) "the deprivation of a constitutional right," and (2) that "the local government is responsible for that violation."[124]  When a plaintiff alleges that she was sexually assaulted by a police officer, that constitutes a deprivation of a constitutional right.[125]  Consequently, Nielson has met this first element.

As stated above, however, to hold a municipality liable, the plaintiff also must show a policy or custom that "leads to, causes, or results in the deprivation."[126]  "When a plaintiff alleges a failure to investigate . . ., the plaintiff must show that the municipality's failure to act constituted an official

---

[121]  Id. at 403–04.

[122]  Id. at 404 (citation omitted).

[123]  Vulcan Pioneers of New Jersey v. City of Newark, No. 02-5802, 2008 U.S. Dist. LEXIS 71256, at *10 (D.N.J. Sept. 9, 2008).

[124]  Cahill v. Walker, No. 3:03-cv-00257, 2005 U.S. Dist. LEXIS 39288, at *12–13 (E.D. Tenn. July 5, 2005).

[125]  Id. at *13.

[126]  Id.

policy or custom which ultimately lead to the deprivation."[127]   More specifically, a plaintiff must show:

> 1) that the police officer's behavior constituted a clear and persistent pattern of sexual misconduct; 2) that the city government had notice or constructive notice of this sexual misconduct; 3) that the [city] was deliberately indifferent to the unconstitutional sexual misconduct, such that its failure to act can be said to amount to an official policy of inaction; and 4) that the [city's] custom directly caused the constitutional deprivation.[128]

In *Cahill*, five prior complaints had been filed against an officer for sexual misconduct.[129] The Chief asserted that he knew complaints had been filed against the officer, but he was unaware they alleged sexual misconduct.[130]  No disciplinary action was taken against the officer for any of the alleged conduct.  Based on these facts, the court concluded the evidence arguably established a pattern of sexual misconduct.[131]  Whether the municipality "had actual or constructive notice of this misconduct" was in dispute.[132]  Consequently, the court could not decide whether the municipality acted with deliberate indifference.[133]  It therefore denied summary judgment.

Here, two separate women alleged that Burnham had raped them.  Additionally, one of the

---

[127]  Id. at *15.

[128]  Id. (citing Doe v. Claiborne County, 103 F.3d 495, 508 (6th Cir. 1996)).

[129]  Id. at *3–4.

[130]  Id. at *4.

[131]  Id. at *15.

[132]  Id. at *16.

[133]  Id.

women provided specific details about incidents of sexual misconduct Burnham engaged in with other women while on duty.  Despite this information, no steps were taken to follow up on those other incidents, other than asking *Burnham* if the allegations were true.  Indeed, the investigator admitted that following up with Sergeant Carruth about the transport of the West Valley woman "had no bearing on what we were looking at on the case" during the first I.A. investigation.  Similarly, the third I.A. investigation essentially began and ended with questioning Burnham about the incident, although there was other evidence available to review.

The circumstances surrounding the third I.A. investigation resulted in Burnham being charged by another police department with domestic abuse and disorderly conduct.  POST issued a letter of caution for his behavior.  Yet, the agency for whom Burnham worked did nothing because it stated it could neither prove nor disprove the allegations.  Moreover, even though the Chief of Police personally thought a pattern was forming after the third I.A. investigation, no action was taken to increase supervision over Burnham, nor was he counseled about his actions.

Merely conducting an investigation does not preclude a finding of deliberate indifference if the investigative procedure is inadequate.  In *Tafoya v. Salazar*, the United States Court of Appeals for the Tenth Circuit reversed the dismissal of a § 1983 action.[134]  In that case, a female inmate was sexually assaulted by a detention officer.[135]  Previously, two other inmates had been assaulted.[136]  As a result, the prison official took steps to install additional cameras, terminate certain employees, and

---

[134] *Tafoya v. Salazar*, 516 F.3d 912, 923 (10th Cir. 2008).

[135] Id. at 914.

[136] Id.

provide sexual harassment training.[137]   The prison official failed to modify, however, how he conducted investigations of complaints that were made.[138]   When complaints were made they were "dismissed by attributing them to attitudes of the complainants."[139]

Here, when Deann reported sexual misconduct, the I.A. investigator initiated questioning about Deann's mental state.   He asked Burnham, "Is she mentally stable?   In your mind?"[140]   This invited Burnham to respond "she hasn't fallen off the rocker, she's more or less tipped over and hasn't regained her balance yet.   I don't think she's . . . . I think she is going that way a little bit."[141]   The remainder of the interview was conducted from this frame of reference.   Similarly, the I.A. investigator discounted Shannon's report.   Despite police photographs, Shannon's written report, Shannon's audio and video-taped interview with the Salt Lake County Sheriff's Office, and charges by that department against Burnham, the I.A. investigator concluded it could not substantiate Shannon's allegations because Shannon would not come into an interview with him, she was intoxicated at the time of the initial report, and she varied her story between saying nothing had happened and that Burnham had abused her.   Yet, when Burnham was questioned, his comments were accepted because he was cooperative.

Based on these circumstances, a reasonable jury could conclude that South Salt Lake showed

---

[137]   Id. at 915.

[138]   Id. at 917.

[139]   Id.

[140]   First I.A. Transcript, 5 (Docket No. 45, Ex. D).

[141]   Id.

deliberate indifference to the sexual misconduct of its officer.  A reasonable jury also could conclude that South Salt Lake's pattern of inaction directly caused the constitutional deprivation allegedly suffered by Nielson.  Summary judgment is therefore denied, and Nielson may proceed on her § 1983 claim against South Salt Lake.

## II.    NEGLIGENCE

As stated above, a municipality cannot be liable for simple or even heightened negligence in failing to supervise or control an officer.  Consequently, Nielson's claim for negligence against South Salt Lake is dismissed.

## III.    STATE CONSTITUTIONAL VIOLATIONS

Nielson also has alleged violations of the Utah Constitution based on due process, cruel and unusual punishment, unreasonable search and seizure, and slavery.  South Salt Lake asserts these claims must be dismissed because (1) no private cause of action exists for constitutional provisions that are not self-executing; (2) it has immunity under the Utah Governmental Immunity Act; and (3) the claims fail for the same reasons the federal claims fail.

### A.    Provisions of the Utah Constitution

#### 1.    Self-Executing

South Salt Lake contends that Nielson's state constitutional claims should be dismissed because the relevant sections are not self-executing.  To be self-executing, a provision must "articulate[] a rule sufficient to give effect to the underlying rights and duties.  In other words, courts may give effect to a provision without implementing legislation if the framers intended the provision

to have immediate effect . . . ."[142]  On the other hand, if a provision is general in nature and does not provide a means for putting it into effect, a provision is not self-executing.[143]

Article I, section 7 (due process) and section 9 (cruel and unusual punishment) have been declared self-executing by the Utah Supreme Court.[144]  South Salt Lake concedes this in its reply brief.  It still challenges, however, whether Article 1, section 14 (unreasonable search and seizure) and Article 1, section 21 (slavery) are self-executing.  The court finds that it need not address this issue based on other Utah law.

2.  <u>Damages Remedy</u>

Even if certain provisions under the Utah Constitution are self-executing, a second hurdle exists to obtain recovery under a state constitutional claim.  The Utah Supreme Court has stated that only the Takings Clause in the Utah Constitution expressly provides a damages remedy for a constitutional violation.[145]  Moreover, "under Utah law, 'there is no express statutory right to damages for one who suffers a constitutional tort.'"[146]  Thus, "a Utah court's ability to award damages for [a] violation of a self-executing constitution provision rests on the common law."[147]

To avoid easily creating judicial remedies for constitutional violations, the Utah Supreme

---

[142]  <u>Bott v. DeLand</u>, 922 P.2d 732, 737 (Utah 1996) (citations omitted).

[143]  <u>Id.</u> (citation omitted).

[144]  <u>Spackman v. Bd. of Ed. of Box Elder County</u>, 2000 UT 87, ¶¶ 9–10, 16 P.3d 533.

[145]  <u>Id.</u> ¶ 20.

[146]  <u>P.J. v. State</u>, No. 2:05cv00739, 2006 U.S. Dist. LEXIS 40393, at *7 (D. Utah June 16, 2006) (quoting <u>Spackman</u>, 2000 UT 87, at ¶ 20).

[147]  <u>Id.</u> (quoting <u>Spackman</u>, 2000 UT 87, at ¶ 20).

Court has held "that a plaintiff must establish the following three elements before he or she may proceed with a private suit for damages."[148]  "First, a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights."[149]  "Second, a plaintiff must establish that existing remedies do not redress his or her injuries."[150]  "Third, a plaintiff must establish that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[151]

Even assuming that Nielson can meet the first and third element, the second element requires Nielson to show that existing remedies under § 1983 do not redress her injuries.  Other courts have refused to create a damages remedy for constitutional violations where Congress has provided an adequate remedy already.[152]  Such is the case here.  The state constitutional claims do not provide for any further redress than Nielson can obtain under § 1983.  Accordingly, those claims are dismissed.  Because the court dismisses Nielson's state constitutional claims on this ground, it does not address South Salt Lake's other arguments regarding why the claims should be dismissed.

## CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART, South

---

[148]  Spackman, 2000 UT 87, at ¶ 22.

[149]  Id. ¶ 23 (citations omitted).

[150]  Id. ¶ 24 (citations omitted).

[151]  Id. ¶ 25 (citations omitted).

[152]  Id. ¶ 24 (citing United States Supreme Court cases and cases from other jurisdictions to show that merely suffering a constitutional violation is not enough to create a damages remedy when a remedy exists under another area of law).

Salt Lake's Motion for Summary Judgment.[153]  South Salt Lake is DENIED summary judgment on Nielson's § 1983 claim.  Accordingly, Nielson may proceed on that claim against the city.  South Salt Lake is GRANTED summary judgment on Nielson's negligence and state constitutional claims, and those claims are hereby dismissed.

DATED this 21st day of October, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[153]  Docket No. 37.